VIVIANO, J.
**627 As part of defendant's plea deal, he agreed to resign his position as a state senator and not seek public office during his five-year probationary term. After reviewing the agreement, the trial court determined that these terms violated the separation-of-powers doctrine and public policy. It struck down the terms but, over the prosecutor's objection, enforced the **628 rest of the plea deal. The Court of Appeals affirmed. We took this case to decide whether the resignation and bar-to-office provisions of the plea deal were enforceable, and if not, whether the trial court erred by refusing to allow the prosecutor to withdraw from the deal. We hold that: (1) the question regarding the resignation provision is now moot and we therefore decline to reach it and instead vacate the Court of Appeals' discussion of that issue, (2) the bar-to-office provision is unenforceable as against public policy, and (3) the trial court erred by not permitting the prosecutor to withdraw from the plea agreement under People v. Siebert .[1] We would have further held that the validity of the bar-to-office provision must be assessed under the balancing test in Town of Newton v. Rumery .[2]
I. FACTS AND PROCEDURAL HISTORY
While serving as a state senator, in May 2015, defendant fired his rifle at his ex-wife's car and into the air in her presence. He was charged with felonious assault, MCL 750.82 ; domestic violence, *721 MCL 750.81 ; malicious destruction of personal property (worth $20,000 or more), MCL 750.377a ; and felony-firearm, MCL 750.227b. In February 2016 he entered into a plea agreement that required him to plead guilty to malicious destruction of property in exchange for dismissal of the other charges. The plea agreement included a sentence agreement to a sentence of 10 months in the Wayne County Jail and 5 years' probation. Defendant also had to comply with various other **629 conditions, including the two at issue here: "Resign position as State Senator" (the resignation provision) and "Cannot hold elective or appointed office during full pendency of probation" (the bar-to-office provision).
The plea agreement was put on the record, and defendant pleaded guilty. At a sentencing hearing on March 14, 2016, the court sua sponte struck the resignation and bar-to-office provisions but otherwise sentenced defendant in accordance with the plea agreement. In an order, the trial court explained that the struck provisions represented "an unconstitutional interference by the Prosecutor with the legislative branch of government and with the rights of the defendant's constituents." Further, the order stated that the provisions "offend[ ] the Constitution of the State of Michigan, [are] contrary to public policy and compromise[ ] the integrity of this court." In all other respects, however, the trial court enforced the plea agreement.
The prosecution moved to vacate the plea, arguing that defendant had not yet resigned and thus had failed to comply with the plea agreement. The prosecutor further contended that because the court failed to enforce the entire original agreement, the prosecutor was entitled to withdraw from the plea. The trial judge rejected the prosecutor's motion, finding that vacation would not serve the interests of justice.
Defendant resigned his position as a state senator on April 12, 2016. In an opinion issued on April 18, 2017, the Court of Appeals dismissed the appeal as moot because Smith had voluntarily resigned and expressed no intention of running for office during his probation period.[3] The same day the Court of Appeals issued its opinion, defendant submitted petitions to **630 run for Detroit City Council. He came in second place in the August 2017 primary, but he lost the general election in November.
Before the general election, the prosecutor sought leave to appeal in this Court, contending that the case represented an election-related emergency. We remanded to the Court of Appeals,[4] which affirmed the trial court in an opinion issued August 22, 2017.[5] The Court held that the resignation and bar-to-office provisions were unconstitutional violations of the separation-of-powers doctrine, because only the Legislature could expel its members.[6] Further, the plea agreement "invaded the right of defendant's constituents to 'decide upon his moral and other qualifications' when defendant's crimes did not specifically disqualify him" under pertinent constitutional provisions.[7] The Court also held that the trial court did not abuse its discretion by denying the prosecution's motion to vacate the plea because defendant had fulfilled *722 many of the terms of the plea deal and therefore the prosecution should not be allowed a second opportunity to negotiate.[8] Judge RIORDAN dissented, finding no violation of the separation-of-powers doctrine and asserting that the trial court had abused its discretion by not allowing the prosecutor's withdrawal from the plea agreement.[9]
The prosecutor again appealed, and we ordered oral argument on whether to grant the application, directing the parties to brief:
**631 (1) whether a prosecutor's inclusion of a provision in a plea agreement that prohibits a defendant from holding public office violates the separation of powers, see Const 1963, art 3, § 2 ; see also United States v. Richmond , 550 F.Supp. 605 (E.D.N.Y., 1982), or is void as against public policy, Davies v. Grossmont Union High Sch. Dist. , 930 F.2d 1390, 1392-1393 (C.A. 9, 1991) ; (2) whether the validity of the provision requiring the defendant to resign from public office was properly before the Court of Appeals since the defendant resigned from the Michigan Senate after the Wayne Circuit Court had struck that part of the plea agreement and, if so, whether it violates the separation of powers or is void as against public policy; and (3) whether the trial court abused its discretion by voiding terms of the plea agreement without affording the prosecutor an opportunity to withdraw from the agreement, see People v. Siebert , 450 Mich. 500, 504 [537 N.W.2d 891] (1995).[10 ]
II. STANDARD OF REVIEW
Questions of law are reviewed de novo.[11] Trial court decisions regarding motions to vacate pleas are reviewed for an abuse of discretion.[12]
III. ANALYSIS
A. THE RESIGNATION PROVISION
The first issue is whether the resignation provision in the plea deal is moot. "It is well established that a court will not decide moot issues."[13] A dispute is moot if no controversy exists and any judgment on the matter would lack practical legal effect.[14] Courts will not **632 entertain such abstract issues unless they are "of public significance" and are "likely to recur, yet may evade judicial review."[15] Here, defendant's resignation has already taken effect and cannot be retracted. If we were to strike the provision, our decision on the issue would lack practical legal effect.
The parties have failed to show that this issue is likely to evade review. The trial court struck the resignation provision from the plea deal before defendant voluntarily decided to resign from office. If defendant had not resigned from office, then the *723 Court of Appeals could have properly reviewed the validity of the resignation provision. Consequently, we hold that the issue is moot and we will not address it. In addition, we vacate as moot that part of the Court of Appeals' judgment holding the resignation provision to be invalid.
B. THE BAR-TO-OFFICE PROVISION
The second issue is whether the bar-to-office provision violates the separation-of-powers doctrine or is void as against public policy. Since we generally avoid constitutional decisions if nonconstitutional grounds can resolve a case,[16] we begin with public policy.
"Although the analogy may not hold in all respects, plea bargains are essentially contracts" and can be subject to the same rules and principles governing contracts.[17] One such rule is that contracts contravening public policy are void and unenforceable.[18] Public policy can be found "in our state and federal constitutions, **633 our statutes, and the common law," among other sources.[19] "Plea agreements are subject to the public policy constraints that bear upon the enforcement of other kinds of contracts."[20]
1. RUMERY 'S BALANCING TEST
The United States Supreme Court has provided a framework for assessing whether certain agreements between prosecutors or government officials and criminal defendants violate public policy. In Town of Newton v. Rumery , the Court explained the "well established" balancing test under which "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."[21] That case involved a release-dismissal agreement whereby the prosecutor agreed to drop all charges against a criminal defendant in exchange for a waiver by the defendant of his right to pursue any statutory causes of action against the town or its officials.[22] The criminal defendant then instituted a civil suit alleging that the agreement violated public policy.[23] To determine whether that **634 agreement could stand, the Court held that the above balancing test applied; accordingly, the opinion examined whether the interests in enforcing the agreement were outweighed by public policy concerns.[24]
Rumery 's balancing test was applied to a bar-to-office provision in *724 Davies v. Grossmont Union High Sch. Dist. .[25] There, the plaintiff had previously settled a civil rights complaint against the defendants, including a school district, in part by agreeing not to run for the district's school board.[26] The plaintiff subsequently ran for and won a board position. The United States Court of Appeals for the Ninth Circuit examined whether the provision was unenforceable as a matter of public policy. The court treated the provision as a waiver of rights and looked to Rumery 's balancing test to resolve the case.[27] The court determined that the interests favoring nonenforcement, which included the electorate's right to vote, outweighed the interest in enforcement, **635 which included the settlement of litigation and the protection of voters.[28]
We believe Rumery and Davies point the way forward in this case. It is true that we are not dealing with a release-dismissal agreement.[29] The prosecutor here has not cut a deal to shield a municipality or its officials from liability, and the bar-to-office provision is ostensibly for the public's good, not the prosecutor's private gain. But the interests at stake in the present case are materially similar to those in Rumery and Davies . Prosecutors have broad charging discretion.[30] For this reason, prosecutors are obliged to fulfill the functions of their office without regard to political considerations.[31] Giving prosecutors *725 unfettered discretion to decide which defendants should be excluded **636 from office would allow political considerations to enter into the prosecutor's charging calculus.[32]
Regardless of the prosecutor's motivations, a plea bargain that prevents an individual from holding public office has the same effect as a release-dismissal agreement that bars an individual from office. In each case, the democratic process is affected in ways that may have nothing to do with the voters' assessment of, or ability to assess, a candidate's fitness for office. As such, we conclude that the Rumery framework should apply to bar-to-office provisions in plea bargains.[33]
**637 2. PUBLIC POLICIES FAVORING NONENFORCEMENT
This case, like Davies , "involves the most important political right in a democratic system of government: the right of the people to elect representatives of their own choosing to public office."[34] When the government limits voters' options, the constitutional rights to vote and associate are implicated.[35] As the United States Supreme Court has observed in a somewhat different context, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."[36] The voters' rights are thus burdened by the exclusion of candidates from office.[37] Schemes that affect the "selection *726 and eligibility of candidates ... inevitably affect[ ]-at least to some degree-the individual's right to vote and his right to associate with others for political ends."[38] The practical effect of enforcing a bar on a willing individual's ability to run is "a limitation on the fundamental right to vote ...."[39] "[T]he source of the qualification" on eligibility for office "is of little moment in assessing the qualification's restrictive impact."[40]
These basic principles, and many related ones, permeate our law. To begin, our Constitution provides that **638 "[a]ll political power is inherent in the people."[41] "[T]he right to vote is an implicit 'fundamental political right' that is 'preservative of all rights.' "[42] The right can be regulated, but not impaired,[43] and neither the judiciary nor the Legislature can construct arbitrary exclusions from holding office.[44] In Speed v. Common Council of Detroit , we noted that absent laws regulating eligibility for office, "[t]here is no restriction upon the power of the people to elect, or the appointing power to appoint, any citizen to office, notwithstanding his previous character, habits, or official misconduct."[45]
Moreover, we believe that public offices should not be treated like private property. As Davies observed, "To treat political rights as economic commodities corrupts the political process."[46] Such treatment fundamentally misunderstands the nature of public office: the law has long been clear that there is no property interest in holding public office.[47] As we have stated, "A public office cannot be called 'property,' within the meaning of" various constitutional provisions protecting property interests, including the Due Process **639 Clause.[48] Instead, "[p]ublic offices are created for the purposes of government. They are delegations of portions of the sovereign power for the welfare of the public. They are not the subjects of contract, but they are agencies for the State ...."[49] Thus, public offices cannot be commoditized *727 for the personal benefit of the officeholder or aspiring officeholder.
To enforce these important public policies, courts have closely reviewed deals made by public officials or candidates for office. As we have noted, a contract made by a public officer has been held to be void as against public policy " 'if it interferes with the unbiased discharge of [the officer's] duty to the public ... , or even if it has a tendency to induce him to violate such duty[.]' "[50] Our election laws broaden this policy by making it a misdemeanor to, among other things, "solicit any valuable consideration from a candidate for nomination for, or election to, an office described in this act."[51] The definition of "valuable consideration"-including, among other things, property, money, prizes, offices, and the like-is sweeping, preventing many types of promises that could be extracted from candidates for public office.[52] The statute thus displays the law's hostility to a broad range of deal-making with **640 regard to public office, even by mere candidates and even for noneconomic consideration.
In a similar vein, the common law has long held that agreements impairing elections are void as against public policy.[53] The reason for this rule was that "[p]ublic offices are public trusts, and should be conferred solely upon considerations of ability, integrity, fidelity and fitness for the position."[54] On this basis, agreements procuring a candidate's withdrawal from the pursuit of public office have been found void as against public policy.[55] That is, an agreement not to run for office is unenforceable. It is true that many of these cases involved the exchange of money for the candidate's withdrawal or involved candidates who had been officially nominated.[56] Nonetheless, they were also undergirded by concerns for the electoral process and voting **641 rights. As one court stated, such an agreement "is against public *728 policy because it affects the integrity of the elective franchise and puts it in the power of a corrupt person to defeat the will of the people ...."[57]
Thus, various policies weigh in favor of nonenforcement, including the effect the agreement has on voters' rights and the potential for treating public office as private property.
3. PUBLIC POLICIES FAVORING ENFORCEMENT
Turning to the policies favoring enforcement, we begin by noting that prosecutors have broad charging discretion when pursuing their cases.[58] And "plea bargaining [is] 'an essential component of the administration of justice'."[59] Consequently, at a general level, public policy supports the plea-bargaining process.[60] But these interests are not without limits. A prosecutor has no interest in "enter[ing] into plea agreements at any expense" and regardless of whether the agreement serves the ends of justice.[61] Likewise, a prosecutor may not abuse his or her charging discretion by exercising it in an arbitrary manner.[62] The prosecutor here also notes that the "public expects lawmakers to uphold the laws, and it is appropriate to punish lawmakers, like other members of the public, when they do not." Additionally, the prosecutor and the dissent contend **642 that other defendants can surrender the practice of their professions, and candidates for office should also be able to relinquish their ability to pursue office.
4. APPLICATION
Weighing the interests in this case, we conclude that public policy favors nonenforcement of the bar-to-office provision. As in Davies , "the public interest at stake in this case is of the highest order," as it relates to the heart of the democratic process: voting.[63] By restricting the eligibility of defendant to run for office, the bar-to-office provision restricts the foundational right of voters to select their representatives. Further, we disagree with the prosecutor and the dissent that a candidate for office should be treated like any other professional who can, as a bargaining chip, offer to forgo the right to practice his or her profession. The public policies discussed above reject the notion that public office can be commoditized in this fashion for personal gain. Rather, public offices are public trusts. For this reason and the others detailed above, courts have long looked with skepticism on agreements that affect elections for a candidate's personal gain.
Against these specific and compelling policies, the prosecutor and the dissent offer only generalized interests in the enforcement of the plea agreement.[64] A **643 prosecutor's charging discretion is a background *729 principle that does not entitle a prosecutor to impair elections. Nor does the right to enter plea bargains-or the related need for efficient resolution of criminal prosecutions-justify this bar-to-office provision. In every case, the prosecutor wields charging discretion and can enter plea agreements with the court's approval; to say that tells us nothing about whether the prosecutor should be able to enforce a bar-to-office term in this case. Similarly, the need to punish defendant does not mandate this particular form of punishment, which also impairs the rights of voters by limiting their options. These rationales offered by the prosecutor do not justify the imposition that the bar-to-office provision places on the democratic process.
Another important consideration in our analysis is whether a logical connection exists between the charged crimes and the bar-to-office provision. Davies , after weighing the interests at stake, inquired whether the government had a "legitimate reason" for the waiver of the plaintiff's right to run for office.[65] According to Davies , a "legitimate reason will almost always include a close nexus-a tight fit-between the specific interest the government seeks to advance in the dispute underlying the litigation involved and the specific right waived."[66] Put differently, "[t]he absence of a close nexus will ordinarily show that the government is seeking the waiver of important rights without a legitimate governmental interest that justifies doing so."[67]
**644 In this regard, comparison to our state's laws on eligibility for office is instructive, as they too suggest the need for a nexus. The types of crimes that bar an individual from office typically relate to public office. For example, Const 1963, art 4, § 7 provides that "[n]o person who has been convicted of subversion or who has within the preceding 20 years been convicted of a felony involving a breach of public trust shall be eligible for either house of the legislature." More broadly, Const 1963, art 11, § 8, renders individuals ineligible for office if "within the immediately preceding 20 years" they have been convicted of certain crimes involving dishonesty and the convictions were "related to the person's official capacity while the person was holding any elective office ...."[68] Thus, the law does not exclude every person convicted of a crime from public office-instead, it allows the voters to determine whether commission of crimes unrelated to public office renders a person unfit for public service.
Here, no "close nexus" exists between the charged offenses and defendant's conduct in office. However egregious defendant's alleged offenses may be, they do not *730 directly relate to the duties and responsibilities of public office-he was not charged with misconduct that was in any manner related to public office. Consequently, the prosecutor can point to no legitimate **645 reason for the bar-to-office provision.[69] Its inclusion in the plea agreement reflects, instead, the prosecutor's own conclusion that defendant should not serve in public office.[70] Our laws do not give prosecutors the unilateral authority to make this determination.
For these reasons, we agree with both lower courts that the bar-to-office provision in defendant's plea agreement is void as against public policy.[71]
**646 C. PLEA WITHDRAWAL
The final issue in this case is whether the trial court erred by voiding terms of the plea deal without permitting the prosecutor to withdraw from the agreement. This question need not detain us long. In People v. Siebert , we considered "whether a prosecutor may withdraw from a plea bargain that includes a sentence agreement when the court intends to impose a sentence lower than the agreement calls for."[72] We held that "a prosecutor ... is entitled to learn that the judge does not intend to impose the agreed-upon sentence ... and [be] given an opportunity to withdraw from the plea agreement."[73] This conclusion stemmed, in part, from the prosecution's constitutional interest in being entrusted with the authority to charge defendants.[74] If a court could "maintain its acceptance of the plea over the prosecutor's objection, it would effectively assume *731 the prosecutor's constitutional authority to determine the charge or charges a defendant will face."[75]
In the present case, the trial court did not reject the sentencing provision of the plea agreement, but that fact makes no difference. Siebert instructs that the trial court cannot assume the prosecutor's charging authority by accepting a plea bargain but rejecting its **647 sentencing agreement. In the same way, the trial court cannot seek to enforce a plea bargain except for a bar-to-office provision. When it rejects either the sentence or a plea term like a bar-to-office provision, while keeping the rest of the agreement, the trial court essentially imposes a different plea bargain on the prosecutor than he or she agreed to. In such circumstances, the trial court infringes on the prosecutor's charging discretion. This is impermissible. If the trial court wishes to reject a bar-to-office provision, it must give the prosecutor an opportunity to withdraw from the agreement.
The trial court here did not provide such an opportunity and in fact denied the prosecutor's motion vacate the plea. The Court of Appeals upheld this decision on the basis that allowing the prosecutor to withdraw would subvert the ends of justice. But neither the Court nor defendant has cited any authority for the proposition that a trial court may unilaterally modify the terms of a plea bargain in order to serve the court's notions of justice.[76] Therefore, we hold that the trial court abused its discretion by refusing to allow the prosecutor to withdraw from the plea agreement.
**648 IV. CONCLUSION
In this case, we hold that the bar-to-office provision in defendant's plea agreement is void. We would further hold that when challenged as void against public policy, bar-to-office provisions in plea agreements should be analyzed under the balancing test in Rumery . In the present case, the bar-to-office provision would not survive that test, as the conduct defendant is charged with bears no nexus with his public office. Further, we hold that the trial court erred by voiding the bar-to-office provision but refusing to permit the prosecutor to then withdraw from the plea agreement. Finally, we do not decide whether the resignation provision of the plea agreement is void as against public policy because that question is moot. We thus reverse the Court of Appeals' judgment in part, affirm in part, vacate as moot that part of the Court of Appeals' judgment holding that the resignation provision in the plea agreement was invalid, *732 and remand the case to the trial court for further proceedings consistent with this opinion.
David F. Viviano Bridget M. McCormack Richard H. Bernstein
I concur in full with the Court's unanimous conclusion that the Court of Appeals' evaluation of the resignation provision should be vacated because the provision's validity was moot by the time the issue came before that Court. As explained below, however, I concur only in the judgment as to the lead opinion's analysis of the bar-to-office provision's invalidity.[1] Given our shared conclusion that the bar-to-office **649 provision is invalid, I concur in full with the Court's conclusion that the trial court violated the separation of powers, People v. Siebert , 450 Mich. 500, 537 N.W.2d 891 (1995), and that this matter must therefore be remanded to the trial court to give the prosecutor an opportunity to withdraw from the plea agreement.
The lead opinion invalidates the bar-to-office provision of the plea agreement at issue on the basis of the balancing test established in Town of Newton v. Rumery , 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), rev'g 778 F.2d 66 (C.A. 1, 1985), which was applied to facts somewhat like the ones here in Davies v. Grossmont Union High Sch. Dist. , 930 F.2d 1390 (C.A. 9, 1991). But as the lead opinion notes, Rumery and Davies involved release-dismissal agreements, which are different from the instant plea bargain. In Rumery , the prosecutor agreed to dismiss certain charges against a criminal defendant in exchange for the defendant's releasing any claims under 42 USC 1983 he may have had against the municipality stemming from the prosecution. When the criminal defendant filed his § 1983 action anyway, the town raised the release-dismissal agreement as a defense. The United States Court of Appeals for the First Circuit held that such agreements were per se invalid, and the Supreme Court of the United States reversed, instead developing a balancing test to guide the determination of when such agreements could be upheld and concluding that the agreement in Rumery was valid. In Davies , a § 1983 plaintiff's settlement with the defendant school district included an agreement not to run for a seat on the district's board; the United States Court of Appeals for the Ninth Circuit applied the Rumery test and invalidated this provision when the plaintiff later ran for and won a seat on the board.
**650 I have no specific objection to the Rumery balancing test, but I do not believe it is necessary to decide this case. I believe this case can be more straightforwardly resolved on the basis that the common law of contracts[2] prohibits defendant from bargaining away his ability to run for office for something of value to him: less-punitive criminal charges. As the lead opinion notes, the common law has long held that agreements impairing elections are void as against public policy. I believe this principle, in and of itself, is a complete basis for holding that the plea agreement at issue here was void-defendant could not bargain away his ability to run for public office in exchange for charging considerations *733 and expect to have a court endorse such an exchange.[3] The lead opinion cites several learned treatises, which I believe accurately **651 set out the state of the law on this account.[4] Indeed, it long has been the case that a contract's consideration "must be a thing lawful in itself, or else the contract is void." 2 Blackstone, Commentaries on the Laws of England, p *444. Blackstone also remarked that "it is essential to the very being of Parliament that elections should be absolutely free, therefore all undue influences upon the electors are illegal, and strongly prohibited[.]" 1 Blackstone, Commentaries on the Laws of England, p *178. Particularly condemned were efforts by public officials to manipulate their offices for private gain:
[T]he greatest danger is that in which [the legislators] co-operate, by the infamous practice of bribery and corruption. ... [N]o candidate shall ... give any money or entertainment to his electors, or promise to give any, either to **652 particular persons, or to the place in general, in order to his being elected .... [Id . at *179.]
See also 8 Holdsworth, A History of English Law (1925), p 55 (noting that "tolerance of traffic in offices of trust" was "unintelligible" to the law).
*734 It is, of course, true that few cases deal with this exact set of facts.[5] But I believe Michigan jurisprudence has not hesitated in the past to extend the concept of invalidating contracts that impinge upon elections and public office to new factual scenarios. For example, in Harris v. Chamberlain , 126 Mich. 280, 282-283, 85 N.W. 728 (1901), the parties agreed "that $200 should be paid at all events as soon as [the plaintiff] should cause the defendant to be appointed postmaster," an agreement which "was illegal and made the contract wholly void."[6] In support we cited **653 Snyder v. Willey , 33 Mich. 483, 493-494 (1876), in which we held that it was a valid defense to a promissory note "that part of the consideration of the note was the suppression of the criminal prosecutions against" the note's issuer. Though Snyder was not precisely the same as Harris , Harris reasonably drew upon and extended Snyder .
I also do not believe it matters whether the prosecutor was seeking personal advantage in this case.[7] Our precedents focus on prohibiting the risk of wrongful conduct rather than invalidating only those agreements relating to public officers that actually are the product of corruption. For example, in People ex rel. Plugger v. Overyssel Twp. Bd. , 11 Mich. 222 (1863), several townships along Lake Michigan voted to borrow money to improve harborage along the lakeshore, with each appointing "freeholders" to decide how to spend the money. The combined group of "freeholders" from the several townships awarded a contract to contractors who were themselves "freeholders" and members of the board. When some townships refused to pay, the contractors sued, but we invalidated the agreement even though there was no indication that the contract awarded was for anything other than the low bid and there were enough votes in favor of the contractors awarded the bid to give it to them even if the member-contractors had abstained from participating in the vote. We elaborated:
*735 Actual injury is not the principle the law proceeds on in holding such transactions void. Fidelity in the agent is **654 what is aimed at, and as a means of securing it, the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal. [ Id . at 225-226 (opinion by MANNING, J.).]
The fact that those contractors did not constitute a majority ... , I do not regard as in any respect altering the principle, nor the fact that the contract was let to the lowest bidder. The price alone is but one element embraced in the question, and even this might be affected by their influence, by fixing time and place of the letting, by their right to decide upon the responsibility of the bidders, and by many other circumstances, over which, as members of the board, they might exercise an influence. ... [I]t is manifestly impossible, from the nature of the case, to ascertain and measure the amount of their influence upon the board ....
And though these contractors may, as members of the board, have acted honestly, and solely with reference to the public interest, yet, if they have acted otherwise, they occupy a position which puts it in their power to conceal the evidence of the facts, and to defy detection. [ Id . at 227-228 (opinion by CHRISTIANCY , J.) ].[8 ]
Consequently, I am unpersuaded by the dissent's concern that this "would undermine the effective prosecution and punishment of public corruption." This sort of practical concern seems much the same as the Plugger dissent's observation that "[w]orks of enterprise" "in small and new townships" "cannot usually find many bidders," meaning that "forbidding such contracts [as were at issue] would be equivalent to shutting the best men out from office." Id . at 231 **655 (opinion by CAMPBELL, J.). I am as unmoved as the Plugger majority was. Much of our law undermines effective prosecution in one way or another in furtherance of other goods; prophylactically reducing the risk of political figures trading their status for some measure of impunity from the complete consequences of their criminal acts is one such good, just as reducing the risk of manipulating the bidding process justified invalidating the contract in Plugger even when it could not be shown that the contract was anything other than the low bid and the best deal for the public fisc. I also do not believe it matters whether this agreement came, as the dissent states, "in the course of an arm's-length criminal plea proceeding ... overseen by a judicial tribunal." I believe that "the plea bargain cannot be allowed to supersede" the common law's determination that contracts impairing elections and public office are void as against public policy, even where both parties agree to it and a court has approved it. People v. Keefe , 498 Mich. 962, 965, 872 N.W.2d 688 (2015) ( MARKMAN , J., concurring). Whether the source of the rule is the Legislature (as in Keefe ) or the common law, I believe it must be abided by without regard to whether a court has approved it or a party prefers it.
When courts in other jurisdictions have confronted agreements tending to interfere with who holds public office, they have invalidated them. While no two cases are exactly alike, the common thread is judicial *736 unwillingness to assist public officials in leveraging their offices for private benefit. Thus, in Ham v. Smith , 87 Pa. 63 (1878), the court refused to enforce a contract to pay a candidate to withdraw from a race so his opponent could be substituted on the party's ticket. In Martin v. Francis , 173 Ky. 529, 191 S.W. 259 (1917), a candidate for office gave his opponent a promissory note in exchange for his opponent not running and being **656 appointed the victor's deputy instead. The note "was immoral, illegal and against public policy" because it "affect[ed] the integrity of the elective franchise," id . at 533, 191 S.W. 259, and the promise to appoint, made "without reference to his fitness or qualifications for the place, ... was part of an agreement entered into not for the benefit of the public but pursuant to a corrupt bargain detrimental to the public," id . at 534, 191 S.W. 259. In Basket v. Moss , 115 N.C. 448, 20 S.E. 733 (1894), the defendant was a local postmaster who advised the plaintiff that he would leave his office and see to it that the plaintiff was appointed as his successor if the plaintiff would execute a promissory note to the defendant. When it came time to enforce the agreement, the court said:
Public offices are public trusts, and should be conferred solely upon considerations of ability, integrity, fidelity and fitness for the position. Agreements for compensation to procure these tend directly and necessarily to lower the character of the appointments to the great detriment of the public. Hence such agreements, of whatever nature, have always been held void as being against public policy. ... [T]he moral sense revolts at traffic to any extent in the bestowal of public office. It is against good morals as well as against the soundest principles of public policy. If public offices can be sold or procured for money, the purchasers will be sure to reimburse themselves by dispensing the functions of their offices for pecuniary consideration. [ Id . at 457-458, 20 S.E. 733.]
I also do not see the caselaw as standing for the proposition that an economic exchange is the sine qua non of impropriety. For example, in Buck v. First Nat'l Bank of Paw Paw , 27 Mich. 293 (1873), Buck robbed a bank, and his relatives gave promissory notes to the bank to pay off what he robbed from the bank on the understanding that if his debt was paid off, the bank would use its influence to see to it that he was not **657 prosecuted. When he was prosecuted anyway, his relatives refused to pay. We noted that "[t]he theory of criminal punishment is that it should be graduated to the heinousness of the crime ...." Id . at 298. "Other considerations are not admissible, and whatever tends ... to cause the penalty to be imposed on other grounds, may be said to be opposed to public policy." Id . I take from this that while what was involved happened to be a pecuniary exchange, that was not essential to our reasoning. Instead, what was essential was that a court was being asked to enforce an agreement that related to inducing public officials to act on the basis of something other than what they thought was in the public interest. I agree that "[t]he standards of commerce do not govern, and should not govern, the administration of criminal justice," People v. Reagan , 395 Mich. 306, 314, 235 N.W.2d 581 (1975), but I see no principled reason to conclude that defendant would be barred from escaping the full consequences of his conduct in exchange for money , but can do so in exchange for his political future .
I agree with the lead opinion (and Rumery ) that the common law is the touchstone for our disposition of this case. However, I do not believe that either Blackstone or our predecessors in this Court would have tolerated the arrangement before us if asked, and that there is ample authority *737 from common-law jurisdictions invalidating agreements of this sort. Therefore, it seems unnecessary to me to apply Rumery and Davies to the instant case and extend "the modern tendency to make the balance the measure of all things," Releases, Redress, and Police Misconduct , 136 U Pa L Rev at 862, when we can draw upon existing authority to invalidate this agreement per se under the law of contracts. In reaching this conclusion, I am mindful of the risk of "public policy" becoming nothing **658 more than "the personal preferences of a majority of this Court," because I agree that "such a policy must ultimately be clearly rooted in the law." Terrien v. Zwit , 467 Mich. 56, 67, 648 N.W.2d 602 (2002). But "the boundaries of public policy ... are reflected in our state and federal constitutions, our statutes, and the common law." Id . at 66-67, 648 N.W.2d 602. This decision will not allow judges "to substitute their own personal preferences for those of the public expressed through the regular processes of the law," id . at 68 n. 13, 648 N.W.2d 602, because it is grounded in a longstanding common-law tradition.
For these reasons, I concur in the Court's judgment that the bar-to-office provision at issue was invalid, meaning that the trial court correctly invalidated this provision of the plea agreement, albeit for the wrong reasons. However, as noted, I concur in full that the trial court violated Siebert in not allowing the prosecutor to withdraw from the agreement in contravention of the separation of powers,[9] and I therefore concur in the remand for further proceedings consistent with the Court's judgment.
Elizabeth T. Clement
This case concerns the validity of a plea agreement **659 voluntarily entered into by defendant that imposed upon him the obligation to resign from the state senate and to refrain from holding any elective or appointed office for the five-year duration of his probation. The trial court ruled that those two obligations were invalid and denied the prosecutor's subsequent motion to vacate the agreement. After defendant resigned from the Legislature, the Court of Appeals affirmed. I agree with the lead opinion that the Court of Appeals erred by addressing the validity of the resignation obligation of the agreement because that issue was rendered moot by the fact that defendant had already resigned, and I further agree with the decision to vacate that part of the Court of Appeals judgment. Hence, I concur with that part of the lead opinion. However, for the reasons set forth below, I respectfully disagree with the lead opinion and the concurrence that the Court of Appeals correctly held that the "bar to office" obligation of the agreement was invalid. Hence, I dissent from that part of the lead opinion. *738 I. FACTS AND HISTORY
In May 2015, defendant Virgil Smith, then a Michigan state senator, was involved in an altercation with his ex-wife during which he apparently fired a gun at her, at her car, and into the air in her vicinity. As a result, the prosecutor charged him with domestic violence, MCL 750.81(2) ; malicious destruction of personal property valued at $20,000 or more, MCL 750.377a(1)(a)(i ) ; felonious assault, MCL 750.82 ; and possession of a firearm during the commission of a felony, MCL 750.227b. On February 11, 2016, the prosecutor and defendant entered into a plea agreement whereby defendant would plead guilty to malicious **660 destruction of personal property valued at $20,000 or more, serve a 10-month jail sentence, and be placed on probation for five years. In addition, the agreement provided that defendant must "[r]esign position as State Senator" and "[c]annot hold elective or appointed office during full pendency of probation."[1] Defendant agreed that these constituted his obligations under the plea agreement and supplied a factual basis for his guilty plea in court. The trial court accepted the plea and set a sentencing date for March 14, 2016.
At sentencing, the trial court ruled sua sponte that the obligations of the plea agreement requiring defendant to resign from the Legislature and to refrain from public office during his probation were invalid, explaining in relevant part:
So it would be illegal for me to impose as a condition of sentence that he resign from office and that he not hold public office during the pendency of this probation. It would violate the separation of powers [be]cause I'm a member of the judicial branch and the constitution provides for the removal, a way that legislators can be removed.
* * *
This agreement here in this case subverts both the authority of the senate and that of the Defendant's constituents. It's against public policy, as I indicated, by using a technique that has the possibly [sic] of executive or prosecutorial domination of members of the state [legislature] through forced resignation ....
The court then inquired of the attorneys if either would **661 request to set aside the plea and the prosecutor responded that she "would have to consult." The court then implied that it would likely deny such a motion, asserting that "it would not be in the interest of justice for me to allow this plea to be withdrawn if the prosecutor were to make that motion." Later that same day, the court entered an order voiding the "portions of the plea agreement that required the defendant to '[r]esign [his] position as State Senator' and '[not] hold elective or appointed office during the full pendency of probation' ...."
The prosecutor then moved to vacate the plea, asserting at the March 28, 2016 motion hearing that "our position is if the Court could not go along with it then you should allow us the opportunity to withdraw the plea because that is not what we bargained for." The court denied the motion, stating:
[G]ranting the prosecution's motion to vacate this plea would compromise the Court's integrity by involving it in an act that violates public policy and offends the constitution. It does not matter that the Defendant voluntarily agreed to this portion of the plea agreement because these constitutional protections exist[ ] not for the Defendant's personal benefit, but to protect the rights of the Defendant's *739 constituents and the right of the legislative branch of government.
The court entered a written order denying the prosecutor's motion that same day.
On April 1, 2016, the prosecutor sought leave to appeal in the Court of Appeals, arguing that the trial court erred by voiding the obligations of the plea agreement and abused its discretion by denying the prosecutor's motion to vacate the plea. At about the same time, defendant resigned from the state senate effective April 12, 2016. The Court of Appeals granted **662 leave on August 26, 2016, but on April 18, 2017, it dismissed the appeal as moot. People v. Smith , unpublished per curiam opinion of the Court of Appeals, issued April 18, 2017 (Docket No. 332288) 2017 WL 1399983. The Court of Appeals stated that "[b]ecause defendant voluntarily resigned his seat and appears to have no intention of running for public office during his term of probation, we decline to address the issues regarding the voiding of the plea agreement as moot." Id . at 2. Concerning the motion to vacate the plea, the Court of Appeals explained that "[w]hile we agree that it was an abuse of discretion by the trial court to deny the prosecution's motion to vacate the plea as soon as the trial court expressed its unwillingness to accept the terms of the agreement, granting such relief after the majority of the terms of the agreement have been fulfilled would be fundamentally unfair." Id . at 3. Within hours of the Court of Appeals' dismissal of the appeal as moot, defendant filed petitions for a seat on the Detroit City Council. On April 26, 2017, the prosecutor moved for reconsideration, observing that "[i]t is now beyond question that defendant intends to run for public office during the term of his probation."[2] Nonetheless, the Court of Appeals panel denied the motion for reconsideration.[3]
On July 26, 2017, the prosecutor sought leave to appeal in this Court, and on August 15, 2017, we **663 remanded to the Court of Appeals as on reconsideration granted. People v. Smith , 501 Mich. 851, 899 N.W.2d 407 (2017). Furthermore, we directed the Court of Appeals to issue an opinion no later than 5:00 p.m. on Friday, August 25, 2017, and ordered that any appeal from that decision must be filed no later than 5:00 p.m. on the following Monday.
On August 22, 2017, the Court of Appeals issued its opinion affirming the trial court in all respects. People v. Smith (On Remand) , 321 Mich.App. 80, --- N.W.2d ---- (2017). With regard to the resignation obligation of the plea agreement, the Court of Appeals stated that "the prosecution attempted to punish and expel a member of the state Senate, actions that are reserved solely for the Legislature. ... Because that authority was assigned to the Legislature alone, the prosecution's offering of that plea-agreement term was [itself] an unconstitutional attempt to violate the separation of powers." Id . at 92, --- N.W.2d ----. With regard to the bar-to-office obligation, the Court of Appeals stated that "the prosecution invaded the right of defendant's constituents to 'decide upon his moral and other qualifications' when defendant's crimes did not specifically disqualify *740 him under Const 1963, art 11, § 8, and Const 1963, art 4, § 7." Id . Accordingly, "[t]he trial court properly determined that the terms of the plea agreement requiring defendant to resign from his state Senate seat and to not seek public office for five years were unconstitutional." Id . at 95, --- N.W.2d ----. The Court also held that "the trial court did not abuse its discretion by denying the prosecution's motion to vacate the plea," id . at 98, --- N.W.2d ----, reasoning that "[a]llowing the prosecution in the present case to make that offer, reach an agreement, and then simply have another chance at negotiation after the trial court struck the unconstitutional parts of the **664 agreement would send the wrong message," id . at 97, --- N.W.2d ----.[4]
The prosecutor again sought leave to appeal in this Court, and we scheduled oral argument on the application with the parties to address the following three issues:
(1) whether a prosecutor's inclusion of a provision in a plea agreement that prohibits a defendant from holding public office violates the separation of powers, see Const 1963, art 3, § 2 ; see also United States v. Richmond , 550 F.Supp. 605 (E.D.N.Y., 1982), or is void as against public policy, Davies v. Grossmont Union High Sch. Dist. , 930 F.2d 1390, 1392-1393 (C.A. 9, 1991) ; (2) whether the validity of the provision requiring the defendant to resign from public office was properly before the Court of Appeals since the defendant resigned from the Michigan Senate after the Wayne Circuit Court had struck that part of the plea agreement and, if so, whether it violates the separation of powers or is void as against public policy; and (3) whether the trial court abused its discretion by voiding terms of the plea agreement without affording the prosecutor an opportunity to withdraw from the agreement, see People v. Siebert , 450 Mich 500, 504 [537 N.W.2d 891] (1995). [ People v. Smith , 501 Mich. 852, 852-853, 900 N.W.2d 619 (2017).]
II. STANDARD OF REVIEW
"[T]his Court reviews de novo constitutional questions, including those concerning the separation of powers."
**665 Debano-Griffin v. Lake Co. , 493 Mich. 167, 175, 828 N.W.2d 634 (2013). Further, whether a contractual obligation is contrary to "public policy" presents a question of law that is reviewed de novo. Terrien v. Zwit , 467 Mich. 56, 61, 648 N.W.2d 602 (2002). Finally, a trial court's decision on a motion to vacate a plea is reviewed for an abuse of discretion. People v. Strong , 213 Mich.App. 107, 111-112, 539 N.W.2d 736 (1995).
III. ANALYSIS
A. SEPARATION OF POWERS
Const 1963, art 3, § 2 sets forth the separation-of-powers principle of our state Constitution:
The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another *741 branch except as expressly provided in this constitution.
"This Court has established that the separation of powers doctrine does not require so strict a separation as to provide no overlap of responsibilities and powers." Judicial Attorneys Ass'n v. Michigan , 459 Mich. 291, 296, 586 N.W.2d 894 (1998). Indeed, the overlapping and cross-cutting responsibilities and powers exercised by each of the three branches are properly described as the Constitution's realm of "checks and balances," a realm in which the separate responsibilities and powers of each branch are constrained or limited in some manner by the separate responsibilities and powers of the other two branches. "For example, it may be that the Legislature in exercising its legislative power to enact laws and appropriate monies will sometimes come into conflict with the Governor in exercising her executive power to recommend or veto laws and appropriations."
**666 Nat'l Wildlife Federation v. Cleveland Cliffs Iron Co. , 471 Mich. 608, 644, 684 N.W.2d 800 (2004), overruled on other grounds by Lansing Sch. Ed. Ass'n v Lansing Bd. of Ed. , 487 Mich. 349, 792 N.W.2d 686 (2010) ( LSEA ). " 'The true meaning [of the separation-of-powers doctrine] is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free Constitution.' " Makowski v. Governor , 495 Mich. 465, 482, 852 N.W.2d 61 (2014), quoting Local 321, State, Co. & Muni. Workers of America v. City of Dearborn , 311 Mich. 674, 677, 19 N.W.2d 140 (1945) (alteration in Makowski ).
"The conduct of a prosecution on behalf of the people by the prosecutor is an executive act[.]" Genesee Prosecutor v. Genesee Circuit Judge , 386 Mich. 672, 683, 194 N.W.2d 693 (1972), citing People v. Dickerson , 164 Mich. 148, 153, 129 N.W. 199 (1910). " 'In considering whether to permit a defendant to plead to a lesser offense, the prosecutor legitimately may consider and negotiate a penalty that he or she deems necessary to serve the interests of the People.' " People v. Siebert , 201 Mich.App. 402, 415, 507 N.W.2d 211 (1993), quoting People v. Farrar , 52 N.Y.2d 302, 306-307, 437 N.Y.S.2d 961, 419 N.E.2d 864 (1981).[5]
In ruling that the bar-to-office obligation violated the separation-of-powers principle, the Court of Appeals reasoned that the obligation added a qualification **667 for public office that is not included within our Constitution. See Smith , 321 Mich.App. at 92, --- N.W.2d ----. I respectfully disagree. There are several constitutional provisions concerning the qualifications for public office that are pertinent to this analysis. Const 1963, art 4, § 7 generally governs the qualifications to serve in the state Legislature:
Each senator and representative must be a citizen of the United States, at least 21 years of age, and an elector of the district he represents. The removal of his domicile from the district shall be deemed a vacation of the office. No person who has been convicted of subversion or who has within the preceding 20 years been convicted of a felony involving a breach of public trust shall be *742 eligible for either house of the legislature.
However, Const 1963, art 4, § 8 sets forth an additional qualification to serve in the state Legislature:
No person holding any office, employment or position under the United States or this state or a political subdivision thereof, except notaries public and members of the armed forces reserve, may be a member of either house of the legislature.
Const 1963, art 4, § 16 provides further context for the manner in which state legislative qualifications are to be determined:
Each house, except as otherwise provided in this constitution, shall choose its own officers and determine the rules of its proceedings, but shall not adopt any rule that will prevent a majority of the members elected thereto and serving therein from discharging a committee from the further consideration of any measure. Each house shall be the sole judge of the qualifications, elections and returns of its members , and may, with the concurrence of two-thirds of all the members elected thereto and serving therein, expel a member. The reasons for such expulsion shall be entered in the journal, with the votes and names of the **668 members voting upon the question. No member shall be expelled a second time for the same cause. [Emphasis added.]
Const 1963, art 6, § 19 similarly sets forth the qualifications of judicial officers in this state:
(1) The supreme court, the court of appeals, the circuit court, the probate court and other courts designated as such by the legislature shall be courts of record and each shall have a common seal. Justices and judges of courts of record must be persons who are licensed to practice law in this state.
(2) To be qualified to serve as a judge of a trial court, a judge of the court of appeals, or a justice of the supreme court, a person shall have been admitted to the practice of law for at least 5 years. This subsection shall not apply to any judge or justice appointed or elected to judicial office prior to the date on which this subsection becomes part of the constitution.
(3) No person shall be elected or appointed to a judicial office after reaching the age of 70 years.
Const 1963, art 11, § 8 sets forth disqualifying characteristics that bar an individual from holding public office and certain other positions of public employment:
A person is ineligible for election or appointment to any state or local elective office of this state and ineligible to hold a position in public employment in this state that is policy-making or that has discretionary authority over public assets if, within the immediately preceding 20 years, the person was convicted of a felony involving dishonesty, deceit, fraud, or a breach of the public trust and the conviction was related to the person's official capacity while the person was holding any elective office or position of employment in local, state, or federal government. This requirement is in addition to any other qualification required under this constitution or by law.
The legislature shall prescribe by law for the implementation of this section.
**669 I would conclude that the bar-to-office obligation negotiated by the prosecutor as part of the plea agreement does not violate the separation-of-powers principle. The fundamental reality of the bar-to-office obligation is that it has been entered into voluntarily by defendant, and it has been entered into by defendant as an alternative to a looming criminal conviction that threatens as a practical matter to bar him *743 from holding legislative office for a considerably lengthier time than the period of his probation under the plea agreement.[6] In other words, defendant himself would hold the key to the avoidance of this obligation, merely by dint of choosing to reject the obligation; if he does so, he is in no way subject any longer to the obligation. See People v. Sarnoff , 302 Mich. 266, 273, 4 N.W.2d 544 (1942) ("The condition of the probation order that Sarnoff make the necessary repairs is neither unreasonable nor improper. He may exercise the option either of making these repairs or of serving the full sentence required by law."). Presumably, however, defendant freely chose to accept the bar-to-office obligation because it was deemed to be in his personal interest to do so, and defendant, like all other criminal defendants, is entitled to avail himself of whatever personal circumstances are available in the bargaining process in exchange for reduced levels of exposure to criminal punishment.[7] It would be a feeble victory for one situated as defendant to have been "protected" against **670 a bar-to-office sanction on assertedly constitutional grounds when the quid pro quo is an alternative plea agreement, or no plea agreement at all, resulting in a term of imprisonment, and an effective bar to office, of a far greater length.
Put simply, defendant here may yet seek to hold legislative office if he is so inclined, and each house of the Legislature will continue to retain its constitutional powers under Const 1963, art 4, § 16 as the "sole judge of the qualifications" of its members, including those of the defendant. See Auditor Gen. v. Bd. of Supervisors of Menominee Co. , 89 Mich. 552, 567-568, 51 N.W. 483 (1891) ("Courts will not undertake to decide upon the right of a party to hold a seat in the legislature where, by the constitution, each house is made the judge of the election and qualifications of its own members.") (quotation marks and citation omitted). And in the event that he is, in fact, reelected to legislative office, neither the prosecutor nor this Court may determine that he lacks the right to hold such office by virtue of the obligations to which he would have committed himself under the plea agreement, but as to which he would have reneged. While there will be consequences for such a decision on defendant's part, they will be the same consequences that burden any criminal defendant who reneges on his or her plea obligations. Accordingly, the bar-to-office obligation neither adds a constitutional or other qualification for legislative office nor infringes either house's power to judge the election and qualifications of its own members[8] and thus does not violate the separation-of-powers principle.
**671 Several cases from other jurisdictions have indicated that bar-to-office obligations as part of probation orders are valid, although these cases have given little consideration to the separation of powers *744 implications. See, e.g., State v. Williams , 82 Ohio.App.3d 70, 72, 611 N.E.2d 443 (1992) ("Defendant contends the trial court abused its discretion in ordering as a condition of probation that she not hold any public office during the five-year probation period. We are unpersuaded."); United States v. Tonry , 605 F.2d 144, 151 (C.A. 5, 1979) ("If confined, [Congressman] Tonry could have offered himself as a candidate for state office. The condition of his probation made it impossible for him, without risking incarceration, to do as a member of the public what he could have done as a prisoner. This seeming anomaly is illusory ...."), abrogated on other grounds as recognized by Phillips v. City of Dallas , 781 F.3d 772 (C.A. 5, 2015) ; City of Baldwin v. Barrett , 265 Ga. 489, 490, 458 S.E.2d 619 (1995) ("Barrett entered into a bargain with the district attorney to forego seeking or holding public office in exchange for the dismissal of certain criminal charges and for lenient treatment following his plea of guilty to two felony offenses. ... The agreement was sanctioned by the court and incorporated into the sentencing order as a condition of probation."). I believe it likely that the absence of an abundance of caselaw, particularly from Michigan, concerning the proposition in dispute arises from the simple and straightforward fact that most defendants who have negotiated such bar-to-office obligations in exchange for reduced criminal penalties have recognized their advantageousness, as well as their binding nature, and complied with such obligations, absent any appeal.
On the other hand, I acknowledge that other cases, United States v. Richmond , 550 F.Supp. 605 (E.D.N.Y., 1982), and **672 Leopold v. State , 216 Md.App. 586, 88 A.3d 860 (2014), have held that such obligations are violative of the separation-of-powers principle. In Richmond , for example, the United States District Court for the Eastern District of New York concluded that the obligations of a plea agreement requiring a Congressman to resign and withdraw as a candidate for reelection were void, reasoning that "[p]ower to strip a member of Congress of elective office was committed to neither the executive nor the judiciary. It was explicitly reserved to Congress itself." Richmond , 550 F.Supp. at 608. One case on which Richmond relied heavily, but inaptly, in my judgment, was Powell v. McCormack , 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). In that case, the United States Supreme Court concluded that "in judging the qualifications of its members Congress is limited to the standing qualifications prescribed in the Constitution." Id . at 550, 89 S.Ct. 1944. Powell was not a separation-of-powers case; rather, it concerned the power of the United States House of Representatives to exclude an elected Congressman from the 90th Congress. Id . at 549, 89 S.Ct. 1944.[9] Moreover, for the reasons explained previously, the bar-to-office obligation here does not add a qualification for office or infringe the power of a branch of government to determine the qualifications of its own members, so cases such as Powell have no bearing. I accordingly conclude that the 'bar-to-office' obligation does not violate the separation-of-powers principle, and I would reverse the Court of Appeals' ruling to the contrary.[10] **673 *745 B. PUBLIC POLICY
"Although the analogy may not hold in all respects, plea bargains are essentially contracts." Puckett v. United States , 556 U.S. 129, 137, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009). However, with regard to plea agreements, "[t]he standards of commerce do not govern, and should not govern, the administration of criminal justice." People v. Reagan , 395 Mich. 306, 314, 235 N.W.2d 581 (1975). That is, plea agreements "are more than contracts between two parties." People v. Siebert , 450 Mich. 500, 509, 537 N.W.2d 891 (1995). "The values that underlie commercial contract law, and that govern the relations between economic actors, are not coextensive with those that underlie the Due Process Clause, and that govern relations between criminal defendants and the State." Ricketts v. Adamson , 483 U.S. 1, 16, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) (Brennan, J., dissenting). Nonetheless, the public-policy principles applicable to commercial contracts may to a certain extent be relevant in evaluating the validity of plea agreements. United States v.Yemitan , 70 F.3d 746, 748 (C.A. 2, 1995) ("Plea agreements are subject to the public policy constraints that bear upon the enforcement of other kinds of contracts.").
" 'Contracts contrary to public policy, that is those which tend to be injurious to the public or against the public good, are illegal and void, even though actual injury does not result therefrom.' " Federoff v. Ewing , 386 Mich. 474, 481, 192 N.W.2d 242 (1971), quoting 17 CJS, Contracts, § 211, pp 563-565. " 'The principle that contracts in contravention of public policy are not **674 enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests.' " Skutt v. Grand Rapids , 275 Mich. 258, 264, 266 N.W. 344 (1936), quoting Twin City Pipe Line Co. v. Harding Glass Co. , 283 U.S. 353, 356-357, 51 S.Ct. 476, 75 L.Ed. 1112 (1931). "The public policy of Michigan is not merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law." Terrien , 467 Mich. at 67, 648 N.W.2d 602.
As a general rule, making social policy is a job for the Legislature, not the courts. This is especially true when the determination or resolution requires placing a premium on one societal interest at the expense of another: The responsibility for drawing lines in a society as complex as ours-of identifying priorities, weighing the relevant considerations and choosing between competing alternatives-is the Legislature's, not the judiciary's. [ Id . (quotation marks and citations omitted).]
" 'The public policy of the government is to be found in its statutes, and, when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials.' " Skutt , 275 Mich. at 265, 266 N.W. 344, quoting United States v. Trans-Missouri Freight Ass'n , 166 U.S. 290, 340, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). "In ascertaining the parameters of our public policy, we must look to 'policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law.' " Rory v. Continental Ins. Co. , 473 Mich. 457, 471, 703 N.W.2d 23 (2005), quoting Terrien , 467 Mich. at 66-67, 648 N.W.2d 602.
*746 Defendant, as the party challenging the bar-to-office obligation, bears the burden of showing that it is on some grounds void as against public policy. See **675 Barton-Spencer v. Farm Bureau Life Ins. Co. of Mich. , 500 Mich. 32, 42, 892 N.W.2d 794 (2017) ("Plaintiff seeks to avoid this agreement and therefore holds the burden of proving that the contract is invalid."); Larsen v. Burroughs , 224 Iowa 740, 277 N.W. 463, 465 (1938) ("[T]he burden of proof that such a contract is contrary to public policy is upon him who asserts it."). In my judgment, not only has defendant (and the lead opinion and concurrence) failed to show that the bar-to-office obligation is void as against public policy, but the preponderance of public policy, in fact, weighs in favor of upholding that obligation for the following reasons.
First, the United States Supreme Court has recognized the public policy in favor of guilty pleas. "For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious-his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated." Brady v. United States , 397 U.S. 742, 752, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). "For the State there are also advantages-the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof." Id .
Moreover, this Court has recognized the public policy in favor of plea bargaining, which is the principal means of securing guilty pleas:
"Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons. It leads to prompt and largely final disposition of most criminal cases; it avoids much of the **676 corrosive impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned." [ People v. Killebrew , 416 Mich. 189, 198, 330 N.W.2d 834 (1982), quoting Santobello v. New York , 404 U.S. 257, 261, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).]
Put simply, "the general practice of plea bargaining withstands constitutional scrutiny and offers significant benefits to both the defendant and the state." Killebrew , 416 Mich. at 198, 330 N.W.2d 834. Such benefits include, most notably, the " 'prompt and largely final disposition' " of the case. Id ., quoting Santobello , 404 U.S. at 261, 92 S.Ct. 495. These benefits, in my judgment, weigh in favor of allowing the prosecutor and the defendant to negotiate the obligations of the plea agreement free from the kind of judicial interference that would constitute a very real breach of the separation-of-powers principle.[11] Michigan's longstanding public policy in support of respecting freely and fairly reached plea agreements between the prosecutor and criminal defendants serves the interests of both parties, and both such interests can legitimately be cast as "public interests" in *747 terms of the conservation of limited public resources for the highest priority criminal justice purposes.[12]
Second, even beyond the plea-bargaining context, trial courts are permitted to impose individualized **677 sentences for probation, depending on the circumstances of the criminal and the crime itself. Specifically, MCL 771.3(2) lists several obligations that the trial court may impose on the probationer, such as "[e]ngage[ment] in community service." MCL 771.3(2)(e). And MCL 771.3(3) adds that "[t]he court may impose other lawful conditions of probation as the circumstances of the case require or warrant or as in its judgment are proper." Thus, MCL 771.3(3) provides the trial court with broad authority to impose unique and highly personal obligations of probation. I see no reason why the bar-to-office obligation stands outside this broad grant of authority.
Third, additional law of this state-in particular, our Constitution and statutes-suggests that the bar-to-office obligation is valid. While Const 1963, art 11, § 8 only disqualifies a person from "election or appointment to any state or local elective office of this state" when he or she "within the immediately preceding 20 years ... was convicted of a felony involving dishonesty, deceit, fraud, or a breach of the public trust and the conviction was related to the person's official capacity while the person was holding any elective office or position of employment in local, state, or federal government," that provision further states that "[t]his requirement is in addition to any other qualification required under this constitution or by law ." (Emphasis added.) Thus, Const 1963, art 11, § 8 expressly contemplates that conduct extending beyond the specifically described felonies involving "dishonesty, deceit, fraud, or a breach of the public trust" while holding "elective office" may operate as an effective limitation upon **678 holding public office. For instance, although Const 1963, art 11, § 8 only includes a 20-year bar to office for individuals convicted of such felonies, MCL 750.118 provides that "[a]ny executive, legislative or judicial officer who shall corruptly accept any gift or gratuity ... shall forfeit his office, and be forever disqualified to hold any public office ...." (Emphasis added.) And although the 20-year bar to office of Const 1963, art 11, § 8 only applies when an individual is convicted of one of the specifically described felonies "while the person was holding any elective office," MCL 169.267, which imposes a $2 million limitation on expenditures by a "candidate committee," provides that "[i]f a person who is subject to this section is found guilty, the circuit court, on application by the attorney general, may prohibit that person from assuming the duties of a public office or from receiving compensation from public funds, or both." MCL 169.267(4). That is, an individual convicted of violating MCL 169.267 may be prohibited from holding public office even if the violation did not occur while he or she was holding public office. Simply stated, to the extent that the public policy of this state is derived from its Constitution and statutes, such policy seemingly stands in disfavor of allowing those with serious criminal records to serve in public office.[13] *748 I further believe that the bar-to-office obligation is consistent with the principle that the rule of law fundamentally "ensures equality of treatment under the law." LSEA , 487 Mich. at 435, 792 N.W.2d 686 ( CORRIGAN , J., dissenting). Accordingly, we have long recognized that similarly **679 situated criminal defendants must be treated equally by the criminal justice system. See, e.g., People v. Bussey , 82 Mich. 49, 60, 46 N.W. 97 (1890) ("It certainly can be no reproach to any section of our country that all men are treated equally, and served alike, before the law, and that in a criminal trial the worst man in the estimation of the community has the full benefit, with the best, of the presumption that every man is innocent until proven guilty."); People v. Wakeford , 418 Mich. 95, 105 n. 7, 341 N.W.2d 68 (1983) ("It would offend rationality, as well as our sense of equal justice, to require treatment of one defendant committing a single crime identically with another defendant committing four counts of the same crime in the 'same transaction.' "). Therefore, under the equal rule of law, defendant should be treated the same as any other criminal defendant within the criminal justice system. That is, he should be subject to the same sanctions for his criminal conduct as would any other criminal defendant who committed the same criminal conduct. Similarly, he should be entitled to avail himself of the same rights and defenses in a criminal proceeding as any other criminal defendant. But most importantly, in my judgment, he, like any other criminal defendant engaged with prosecutors in the plea-bargaining process, should be allowed to bring to bear the fullest range of personal circumstances in securing maximum bargaining leverage on his own behalf.[14] Concluding otherwise would mean that defendant because of his status as a **680 politician would be treated differently from other criminal defendants who are engaged in other career fields and who may freely choose to forgo their right to work in those particular fields in exchange for reduced criminal penalties. Who would doubt, for example, that a banker who had embezzled funds could voluntarily agree to remain outside that profession in the future in exchange for value in the context of a plea agreement? While the politician certainly has no greater rights than do nonpoliticians in the plea-bargaining process, he or she should also bear no greater disabilities in negotiating on his or her own behalf.
Criminal defendants, such as the instant defendant himself, would be placed at a distinct disadvantage if they could not utilize their future potential to hold public office as a bargaining chip on their own behalf in pursuit of reduced criminal penalties, just as all other defendants can similarly avail themselves of their own unique circumstances. I do not doubt that criminal defendants engaged in such bargaining are often faced with extraordinarily difficult options, placed between Scylla and Charybdis as it were, but I also do not doubt that free and uncoerced decision-making can nonetheless emerge from this process and that such decision-making should as a general proposition be respected.
In ruling that the bar-to-office obligation is void as against public policy, the Court *749 of Appeals reasoned that "[t]acit permission for prosecutors to engage in such negotiations, even if done innocently at the time, could open the door for the executive branch to use its power of prosecution (and the threat of imprisonment) to remove from elected office those officials who do not align with the political preferences of the executive branch." Smith , 321 Mich.App. at 93, --- N.W.2d ----. Similarly, the lead opinion here reasons that "[g]iving prosecutors unfettered **681 discretion to decide which defendants should be excluded from office would allow political considerations to enter into the prosecutor's charging calculus." Ante at 724-25. I believe that this concern is vastly overstated.
"We have previously recognized that the decision whether or not to prosecute, and what charge to bring, generally rests in the prosecutor's discretion." People v. Johnson , 427 Mich. 98, 113, 398 N.W.2d 219 (1986) (opinion by BOYLE , J.). And there can be no dispute that a prosecutor possesses the discretion to bring charges against a public official, even when those charges would result in that official's exclusion from public office, so long as the charges are justified by the law and facts of the case. When, however, the charges are wholly unjustified and constitute an abuse of power, courts may intervene to protect the public official as they would any other defendant. See, e.g., People v. Grove , 455 Mich. 439, 461 n 27, 566 N.W.2d 547 (1997) ("[A] prosecutor's determination of what charges to bring is subject to judicial review only for an abuse of power ...."), superseded by court rule on other grounds as stated in People v. Franklin , 491 Mich. 916, 813 N.W.2d 285 (2012). I discern little principled basis for distinguishing the ordinary case in which a prosecutor is enabled to bring charges against a public official and the case in which the prosecutor negotiates a bar-to-office obligation in a plea agreement. In both instances, there are significant implications for the people's decision to confer representative authority upon a particular individual, and the prosecutor's conduct is always subject to review and scrutiny for an abuse of power. I would decline, however, to categorically bar prosecutors from negotiating bar-to-office obligations out of the speculative concern that a prosecutor might on some future occasion abuse his or her powers in order to gain **682 political, partisan, or personal advantage. Our entire criminal justice system is predicated on the proposition that prosecutors will act honorably, and that proposition ought to be extended to the core prosecutorial responsibility addressed in this case: the negotiation of guilty pleas. As with every other responsibility of the prosecutor, his or her exercise of this responsibility should be subject to the regular review of courts, state disciplinary authorities, the media, and the public, rather than categorically prohibited on the off chance that the power might someday be abused.[15]
Therefore, I would hold that the bar-to-office obligation is in no way void as *750 against public policy and would reverse the Court of Appeals' ruling to the contrary.[16]
IV. RESPONSE TO LEAD OPINION
In concluding that the bar-to-office obligation is void as against public policy, the lead opinion reasons that "[b]y restricting the eligibility of defendant to run for **683 office, the bar-to-office provision restricts the foundational right of voters to select their representatives." Ante at ----. I respectfully disagree because that "foundational right" is not, in my judgment, the proper focus of the required public-policy analysis.
When considering whether to void a contractual obligation on the basis of public policy, the public policy "is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests .' " W.R. Grace & Co. v. Local Union 759 , 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), quoting Muschany v. United States , 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945) (emphasis added). That is, "absent some specific basis for finding them unlawful, courts cannot disregard private contracts and covenants in order to advance a particular social good." Terrien , 467 Mich. at 70, 648 N.W.2d 602 (emphasis added). In Terrien , this Court quoted Justice Scalia to explain when a purported "public policy" may be sufficient to justify voiding a contractual provision: " 'There is not a single decision, since this Court washed its hands of general common-lawmaking authority, in which we have refused to enforce on "public policy" grounds an agreement that did not violate, or provide for the violation of, some positive law.' " Id . at 68 n. 12, 648 N.W.2d 602, quoting Eastern Associated Coal Corp. v. United Mine Workers of America, Dist 17 , 531 U.S. 57, 68, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (Scalia, J., concurring). Thus, for example, in Mulliken v. Naph-Sol Refining Co. , 302 Mich. 410, 4 N.W.2d 707 (1942), this Court ruled that a contract that fixed the price of gasoline was void as against public policy because it violated a statute prohibiting price-fixing to undermine competition. To substitute in the public-policy analysis- one predicated upon genuine public policies- a vague and generalized public-interest analysis is to substitute judicial **684 preferences for those actually enacted and adopted by the people; the former are grounded in some way in actual and concrete policies and practices, while the latter are so overarching that, while they may indeed be legitimate public interests, they are also subject to countless exercises in balancing with contrary public interests.
Of course, I agree with the lead opinion that as a broad and general proposition, the people have a "foundational right" in the freedom to vote for individuals of their choice. However, this is largely an aspirational goal that must often give way to contrary interests. In this regard, the people themselves, through their own representative legal processes, have imposed limitations on the universe of individuals from among whom they may elect their public officials. There are minimum,[17] and maximum,[18] age restrictions on candidates;
*751 there are restrictions in terms of a person's criminal history;[19] there are restrictions in terms of the process by which candidates must pursue a position on the ballot;[20] there are residency restrictions;[21] there are **685 citizenship restrictions;[22] there are restrictions based on the lack of registration as an elector;[23] there are educational restrictions;[24] there are professional restrictions;[25] there are restrictions grounded in the discretion of the Legislature;[26] there are restrictions based on the judgments of political conventions;[27] there are restrictions based on when a person decides to become a candidate;[28] and perhaps most significantly and most pertinently, there is the logical threshold requirement that a person must himself or herself assent to being placed upon the ballot. As such restrictions illustrate, there is no singular "public policy" concerning the right of the voters to elect whomever they choose. I am hard-pressed, in light of these and other restrictions upon the "voters' right" to select representatives of their choice, to understand why today we establish as the "public policy" of this state, after 180 years in which there was no such "public policy," that a bar-to-office obligation, imposed by a court of law, as part of an arm's-length plea agreement, pertaining to a felony offense, and agreed to by both prosecutor and **686 defendant, should be rendered void. Once again, the lead opinion has identified no positive law and no specific policy that the bar-to-office obligation allegedly violates.[29] It has only identified a broad and generalized public interest in the people voting for persons of their choice that has been limited on many *752 occasions in favor of other more particularized interests.[30] **687 Furthermore, I believe the lead opinion errs by assuming that the bar-to-office obligation would be specifically enforced by the judiciary if defendant decides to seek and hold public office. Ante at 725 ("Regardless of the prosecutor's motivations, a plea bargain that prevents an individual from holding public office has the same effect as a release-dismissal agreement that bars an individual from office."). This, however, is not how the bar-to-office obligation operates. Rather, for the reasons explained earlier in this opinion, defendant fully retains the option of seeking and holding public office, and if he does so, neither the trial court nor the prosecutor possesses the authority to stop him from doing so, or to remove him from public office if elected, because he has violated that obligation of probation. A breach of the bar-to-office obligation does not allow either the prosecutor or the judiciary to specifically enforce the obligation, but simply renders the plea agreement null and void, potentially subjecting the defendant to criminal penalties of which he had been relieved in whole or in part by the agreement.[31] Therefore, the bar-to-office obligation does not even restrict the right of voters to elect whomever they choose, including the defendant, but they do not have the right to dragoon into a candidacy a person who views his or her personal interests to lie elsewhere.[32] **688 *753 Of course, as a practical matter, defendant may be less inclined to seek and hold public office because he may want to retain the benefits of his plea agreement, particularly the reduction of his criminal penalties. However, to the extent that defendant is less inclined to seek and hold public office for this reason, this is exclusively a function of his own decision to have, first, engaged in criminal conduct and, secondly, to have agreed upon the bar-to-office obligation. Put simply, he freely decided as part of a plea agreement to forgo his right to hold public office in order to avoid greater criminal penalties, and he is entitled to act in own his best interests in limiting the extent of such exposure. To conclude otherwise would mean that an individual could decide against seeking and holding public office for a variety of self-interested reasons, but could not do so for the single self-interested reason that he or she would be subject to lesser criminal penalties. While the electorate as a general proposition has the right to elect individuals of its own choosing, it does not have the right to elect individuals who themselves choose not to run for public office for their own reasons, whatever these may be.[33] **689 The lead opinion also identifies a secondary purported "public policy" in voiding the bar-to-office obligation: that public offices "should not be treated like private property." Ante at 726. Once again, while one could hardly disagree that there is such a public interest, this public interest is also too broad and generalized to be considered a genuine "public policy" sufficient to void a bar-to-office provision of a plea agreement; that public offices "should not be treated like private property" is an obvious proposition of good government but because of its very breadth it begs the question whether this interest is best facilitated by disallowing corrupt and criminal politicians from entering into plea agreements not to run for future public office or encouraging them not to do so. It is like most public interests , as opposed to public policies , subject to the normal give-and-take of public and judicial debate. In the end, the lead opinion's "public interest" sounds more as a function of judicial preference than as an actual policy determination undertaken by the people themselves. It is again a merely aspirational goal rather than a concrete and bona fide public policy.[34] *754 Finally, by concluding that the bar-to-office obligation is void because there is no " 'close nexus' ... between the charged offenses and defendant's conduct in office," ante at 729, I respectfully believe the lead **690 opinion fails to give sufficient consideration to the fact that this case is criminal in nature and concerns a voluntary plea agreement. Our law has never before required a "close nexus" between an obligation of probation and the crime committed by the defendant, particularly when the obligation at issue constitutes part of a plea agreement. If a "close nexus" were required by the law, I submit that probation proceedings in general would be transformed. For instance, MCL 771.3(2)(e) provides that "[a]s a condition of probation, the court may require the probationer to ... [e]ngage in community service." And MCL 771.3(2)(q) provides that the court may require the probationer to "[c]omplete his or her high school education or obtain the equivalency of a high school education in the form of a general education development (GED) certificate." I see no reason why a defendant should not be allowed to agree to such obligations of probation, even when the obligations lack a "close nexus" to the crimes that he or she has committed. Such obligations presumably serve the benefit of both the public and the defendant, and it is not the role of this Court to micromanage a novel "close nexus" requirement.
In summary, the bar-to-office obligation is sustained by actual "public policies" grounded in the law of this state, and the allegedly competing "public interests " identified by the lead opinion in voiding that obligation are overly broad, overly generalized, and overly aspirational in nature. The lead opinion has simply not satisfied its burden of showing that the bar-to-office obligation is void as against public policy, and therefore the obligation should be sustained. Accordingly, I respectfully dissent from this part of the lead opinion.
**691 V. RESPONSE TO CONCURRENCE
My disagreement with the concurrence is even more substantial. While the lead opinion apparently leaves open the possibility that a defendant could agree to a bar-to-office obligation as part of a plea agreement if there is a "close nexus" between the holding of public office and the crimes committed by the defendant- such as perhaps, when the defendant has accepted bribes while holding public office- the concurrence would establish an unvarying rule that a defendant simply cannot "bargain[ ] away his ability to run for office for something of value to him: less-punitive criminal charges." Ante at 732 (CLEMENT, J., concurring in part). This rule, in my judgment, would undermine the effective prosecution and punishment of public corruption. For example, a public official who violates MCL 750.118 is, by law, "forever disqualified to hold any public office ...." Yet, following the rationale of the concurrence, such an official could never enter into a plea for a reduced charge that included a bar-to-office obligation, as this would constitute "bargaining away his ability to run for office for something of value." While it might well be the case that a plea of any sort is ill-advised in a particular case, I do not understand what "public policy" informs the conclusion that the prosecutor cannot under any circumstance through a voluntary agreement with a defendant seek to ensure that he or she not be returned to public office. This is an entirely judicially manufactured "public policy" that is incompatible *755 with this state's actual "public policy," one determined by the elected representatives of the people.
Furthermore, in reciting its rule that a defendant can never "bargain away his ability to run for office,"
**692 the concurrence relies on cases that concern corruption or the possibility of corruption in the agreement itself . See, e.g., Benson v. Bawden , 149 Mich. 584, 587, 113 N.W. 20 (1907) ("The postmaster must exercise his official judgment. He should be disinterested. That he may be hired to act in the interest of any individual is shocking to a decent sense of propriety."). However, " '[t]he principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests .' " Skutt , 275 Mich. at 264, 266 N.W. 344 (citation omitted; emphasis added). See also Restatement Contracts, 2d, § 178(3)(b), p 7 ("In weighing a public policy against enforcement of a [contractual] term, account is taken of ... the likelihood that a refusal to enforce the term will further that policy ...."). The reason specifically for the public policy against the sale of office by contract- the potential for corrupt behavior occasioned by the agreement itself- is not reasonably implicated in cases in which the bar-to-office obligation is agreed to by both the prosecutor and the defendant in the course of an arm's-length criminal plea proceeding and overseen by a judicial tribunal. That is, invalidating the bar-to-office obligation under the circumstances of this case, by plea agreement, as should be obvious to all, would in no way impede corrupt behavior or corrupt agreements.[35] Because this case implicates none of the **693 "reasons" pertaining to the public policy against the sale of public office, I would reject the analysis[36] of the concurring opinion.[37] *756 VI. CONCLUSION
Defendant voluntarily and with the advice of counsel entered into a plea agreement whereby he agreed to resign from the Legislature and to refrain from holding elected or appointed office for the duration of his five-year probation. He now challenges these obligations while seeking to retain the remainder of the benefit derived from his plea agreement. I agree with the lead opinion that the resignation obligation is moot **694 and that the part of the Court of Appeals judgment addressing that issue is properly vacated. However, after consideration of the separation-of-powers principles set forth within our Constitution and the public policy reflected by Michigan law, I would conclude that the bar-to-office obligation of the plea agreement is entirely valid and thus disagree with the lead opinion and the concurrence to the extent they conclude otherwise. Accordingly, I would reverse the Court of Appeals to the extent that it ruled that the bar-to-office obligation was invalid and remand the case to the trial court for further proceedings.
Brian K. Zahra
Kurtis T. Wilder

People v. Siebert , 450 Mich. 500, 537 N.W.2d 891 (1995).

Town of Newton v. Rumery , 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). Because the partial concurrence did not join this portion of the opinion, adoption of the Rumery test failed to garner majority support.

People v. Smith , unpublished per curiam opinion of the Court of Appeals, issued April 18, 2017 (Docket No. 332288) 2017 WL 1399983.

People v. Smith , 501 Mich. 851, 899 N.W.2d 407 (2017).

People v. Smith (On Remand) , 321 Mich.App. 80, --- N.W.2d ---- (2017).

Id . at 92, --- N.W.2d ----.

Id .

Id . at 97-98, --- N.W.2d ----.

Id . at 103-105, --- N.W.2d ---- (RIORDAN, J., dissenting).

People v. Smith , 501 Mich. 852, 852-853, 900 N.W.2d 619 (2017).

People v. Dupree , 486 Mich. 693, 702, 788 N.W.2d 399 (2010).

People v. Strong , 213 Mich.App. 107, 111-112, 539 N.W.2d 736 (1995).

People v. Richmond , 486 Mich. 29, 34, 782 N.W.2d 187 (2010).

T.M. v. M.Z. , 501 Mich. 312, 316-18, 916 N.W.2d 473 (2018) (Docket No. 155398), slip op. at pp. 4-5, 2018 WL 2293045.

Richmond , 486 Mich. at 37, 782 N.W.2d 187.

J & J Constr. Co. v. Bricklayers & Allied Craftsmen, Local 1 , 468 Mich. 722, 734, 664 N.W.2d 728 (2003).

Puckett v. United States , 556 U.S. 129, 137, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009).

See Mahoney v. Lincoln Brick Co. , 304 Mich. 694, 706, 8 N.W.2d 883 (1943).

Terrien v. Zwit , 467 Mich. 56, 67, 648 N.W.2d 602 (2002). As the dissent is well aware, see post at 745-46, and despite its intermittent protestations to the contrary, see post at 750-52, under Michigan law, public policy may be grounded in the common law. See Terrien , 467 Mich. at 66-67, 648 N.W.2d 602 ("In identifying the boundaries of public policy, we believe that the focus of the judiciary must ultimately be upon the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law .") (emphasis added).

United States v. Yemitan , 70 F.3d 746, 748 (C.A. 2, 1995).

Town of Newton v. Rumery , 480 U.S. 386, 392, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), citing Restatement Contracts, 2d, § 178(1).

Rumery , 480 U.S. at 390-391, 107 S.Ct. 1187.

Id . at 391, 107 S.Ct. 1187.

A majority agreed with this approach, but Justice O'Connor concurred separately to explain that she would explicitly require defendants to prove that the agreement served public interests. She also discussed various factors to consider in the balancing test. Id . at 399, 401-402, 107 S.Ct. 1187 (O'Connor, J., concurring). The Court also discussed the relationship between a release-dismissal agreement and a plea bargain, noting that they are not completely analogous. Id . at 393 & n. 3, 107 S.Ct. 1187 (opinion of the Court). Nonetheless, the Court relied on principles from the plea-bargain context, and subsequent courts have applied Rumery to plea bargains containing release-dismissal agreements. See e.g., Burke v. Johnson , 167 F.3d 276, 285 (C.A. 6, 1999) (noting that "the release/dismissal agreement [was] ... entered into as part of a plea agreement").

Davies v. Grossmont Union High Sch. Dist. , 930 F.2d 1390 (C.A. 9, 1991).

Id . at 1392. The plaintiff also received $39,200 for settling the suit, id ., but that payment did not figure significantly in the court's analysis, constituting only an alternative rationale for rejecting one piece of the defendant's argument.

Id . at 1396, citing Rumery , 480 U.S. 386, 107 S.Ct. 1187.

Id . at 1397-1398.

Our Court of Appeals has employed the Rumery analysis to release-dismissal agreements, noting that it is a "flexible" approach that "protects against ... potential misconduct ... while allowing for situations where release-dismissal agreements advance the public interest." Stamps v. City of Taylor , 218 Mich.App. 626, 634, 554 N.W.2d 603 (1996).

People v. Ford , 417 Mich. 66, 84, 331 N.W.2d 878 (1982).

See, e.g., ABA Standards for Criminal Justice: Prosecutorial Investigations (3d ed), Standard 26-3.6 (directing prosecutors to "generally not make decisions related to a criminal investigation based upon their impact on the political process" and to make decisions that limit the political impact); Attorney General Memorandum for All Department of Justice Employees Concerning Election Year Sensitivities (Mar 9, 2012), p 1, available at < https://www.justice.gov/sites/default/files/oip/legacy/ 2014/07/23/ag-memo-election-year-sensitivities.pdf> (accessed July 18, 2018) [https://perma.cc/WWV7-C27J] ("Simply put, politics must play no role in the decisions of federal investigators or prosecutors regarding any investigations or criminal charges. Law enforcement officers and prosecutors may never select the timing of investigative steps or criminal charges for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose is inconsistent with the Department's mission and with the Principles of Federal Prosecution.").

Cf. In re Christoff , 690 N.E.2d 1135, 1136 (Ind., 1997) (concluding that the incumbent prosecutor and his chief deputy committed professional misconduct by "threatening to renew a long-dormant criminal investigation against a political candidate seeking the office occupied by [the] incumbent prosecutor ... unless the candidate opted to forgo his bid to seek the office"). Here, there is no allegation that the prosecutor was motivated by anything other than her desire to protect the public. Nor is there any suggestion that other prosecutors in this state are misusing their charging authority in this fashion. Rather, our point is only that categorical acceptance of bar-to-office provisions opens the door to self-interested plea deals in the same way that the United States Supreme Court thought that automatically allowing release-dismissal agreements would potentially allow prosecutors to seek private gain. See Rumery , 480 U.S. at 395, 107 S.Ct. 1187 ; cf. United States v. Richmond , 550 F.Supp. 605, 608-609 (E.D.N.Y., 1982) (noting that the prosecutor's ability to use even "a private hint of prosecution" represented an "intolerable" possibility of abuse).

We apply Rumery in this case because of the similarities between bar-to-office provisions in release-dismissal agreements and in plea bargains. We do not intend to suggest, however, that Rumery 's balancing test should be used to assess plea agreements or probationary terms more broadly, without regard to the nature of the rights at stake. In this regard, it is worth noting that application of the balancing test in the context of pursuit of office is not novel. Federal courts have applied a similar test to determine whether a public employee could be disciplined at work for speeches made while the employee was pursuing public office-these courts ask whether the employee's interest in his or her campaign speech outweighs the interests of the public employer. See, e.g., Murphy v. Cockrell , 505 F.3d 446, 452 (C.A. 6, 2007) (applying balancing test), citing Pickering v. Bd. of Ed. , 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ; Newcomb v. Brennan , 558 F.2d 825, 830 (C.A. 7, 1977) (same); Magill v. Lynch , 560 F.2d 22, 27 (C.A. 1, 1977) (same).

Davies , 930 F.2d at 1397.

Id . at 1396-1397 ; Anderson v. Celebrezze , 460 U.S. 780, 787-788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

Bullock v. Carter , 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

Anderson , 460 U.S. at 787-788, 103 S.Ct. 1564.

Id . at 788, 103 S.Ct. 1564.

Davies , 930 F.2d at 1398.

U.S. Term Limits, Inc. v. Thornton , 514 U.S. 779, 820, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995).

Const 1963, art 1, § 1.

In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71 , 479 Mich. 1, 16, 740 N.W.2d 444 (2007), quoting Reynolds v. Sims , 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (cleaned up).

Todd v. Bd. of Election Comm'rs , 104 Mich. 474, 482, 64 N.W. 496 (1895).

Attorney General ex rel. Cook v. O'Neill , 280 Mich. 649, 656, 274 N.W. 445 (1937) ; see also Schweitzer v. Plymouth City Clerk , 381 Mich. 485, 493-494, 164 N.W.2d 35 (1969) (explaining that the electorate can establish qualifications for office and that courts should not attempt "from the depths of their urbanity [to] impose upon the people ... a 'purer' form of democracy than they choose for themselves").

Speed v. Common Council of Detroit , 98 Mich. 360, 364, 57 N.W. 406 (1894).

Davies , 930 F.2d at 1398.

See Basket v. Moss , 115 N.C. 448, 457, 20 S.E. 733 (N.C., 1894).

Attorney General v. Jochim , 99 Mich. 358, 367-368, 58 N.W. 611 (1894).

Id . ; see also Taylor v. Beckham , 178 U.S. 548, 577, 20 S.Ct. 890, 44 L.Ed. 1187 (1900) ("The decisions are numerous to the effect that public offices are mere agencies or trusts, and not property as such," and "the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right."); Molinaro v. Driver , 364 Mich. 341, 350, 111 N.W.2d 50 (1961) ("An office holder has no contract rights or vested rights to public office.").

Sellars v. Lamb , 303 Mich. 604, 609, 6 N.W.2d 911 (1942) (citation omitted).

MCL 168.931(1)(c).

MCL 168.931(4) (" '[V]aluable consideration' includes, but is not limited to, money, property, a gift, a prize or chance for a prize, a fee, a loan, an office, a position, an appointment, or employment.").

See Clark, Hand-book of the Law of Contracts (1894), § 185, p 428 ("Any agreement which tends to impair the integrity of public elections is clearly contrary to public policy."). This rule has been echoed numerous times by treatise writers through the present. See 7 Williston, Contracts (4th ed), § 16:8, p 439 ("[A] bargain between rival candidates that one would withdraw in consideration of a promise by the other to appoint the withdrawing party to office is illegal[.]"); 17A CJS, Contracts, § 290, p 153 ("Agreements which tend to impair the integrity of public elections are contrary to public policy."); McCrary, A Treatise on the American Law of Elections (4th ed), § 220, p 166 ("The principles of public policy, which forbid and make void all contracts tending to the corruption of elections, apply equally to what are called primary or nominating elections, or conventions, although these are mere voluntary proceedings of the voters of certain political parties."); Greenhood, The Doctrine of Public Policy in the Law of Contracts (1886), Rule CCCXXII, p 387 (noting that a contract that "is calculated to exercise an injurious influence over the purity of elections" is void); Fry, A Treatise on the Specific Performance of Contracts (1871), § 309, p *144 n 2 ("Contracts affecting public elections are held void[.]") (italics omitted).

Basket , 115 N.C. at 457, 20 S.E. 733.

Ham v. Smith , 87 Pa. 63, 66 (1878).

See, e.g., Martin v. Francis , 173 Ky. 529, 533, 191 S.W. 259, 259-260 (1917) (explaining that allowing such a bargain would be tantamount to "a fraud on the people who nominated" the candidate and preclude the political party's ability to even put forward a candidate).

Id .

See Ford , 417 Mich. at 84, 331 N.W.2d 878.

People v. Killebrew , 416 Mich. 189, 197, 330 N.W.2d 834 (1982), quoting Santobello v. New York , 404 U.S. 257, 260, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

See People v. Rodriguez , 192 Mich.App. 1, 4-5, 480 N.W.2d 287 (1991).

Id . at 6-7, 480 N.W.2d 287.

See Ford , 417 Mich. at 84, 331 N.W.2d 878.

Davies , 930 F.2d at 1397.

After citing our court rule permitting plea bargains, MCR 6.302(C)(1), and a few broad comments from the United States Supreme Court and this Court emphasizing positive aspects of the plea-bargaining process-with which we have no quarrel-the dissent discerns a "longstanding public policy in support of respecting freely and fairly reached plea agreements between the prosecutor and criminal defendants ...." Post at 746. However, ironically, the dissent cites no constitutional, statutory, or common-law authority for this proposition, upon which much of its analysis rests. See Terrien , 467 Mich. at 66-67, 648 N.W.2d 602. And the court rule the dissent cites merely recognizes that plea bargains are permitted, not that they are favored or should always be enforced.

Davies , 930 F.2d at 1399.

Id .

Id .

Relevant statutes display the same emphasis on misconduct related to public office. MCL 750.118 provides that an officer of any of the three branches of government who accepts a bribe or offers to make gifts in exchange for official action shall "be forever disqualified to hold any public office" in this state. Even when the subject of the statute is not a public official, statutory bar-to-office laws can involve public office. For example, if a person violates the $2 million limitation on "candidate committee" expenditures, he or she can be punished by being "prohibit[ed] ... from assuming the duties of a public office ...." MCL 169.267(4).

Compare the prosecutor's argument here with City of Baldwin v. Barrett , 265 Ga. 489, 458 S.E.2d 619 (1995), in which the Georgia Supreme Court upheld a bar-to-office provision in a plea deal with a mayor who pleaded guilty to theft and forgery while in office. The Court noted that the prosecutor's interest in the provision was "safeguard[ing] the public interest by preventing [the defendant] from holding a position where he may repeat the misconduct." Id . at 490, 458 S.E.2d 619. No similar interest is alleged here, nor would keeping defendant out of office prevent him from repeating the offenses he was charged with. Using a rationale similar to the one suggested in Barrett , the United States Department of Justice only permits federal prosecutors to seek bar-to-office provisions in plea agreements "with public officials who are charged with federal offenses that focus on abuse of the office(s) involved." United States Department of Justice, US Attorneys' Manual , § 9-16.110, available at < https://www.justice.gov/usam/usam-9-16000-pleas-federal-rule-criminal-procedure-11#9-16.110> (accessed July 18, 2018) [http://perma.cc/YN43-LS4H].

The prosecutor sought an expedited ruling in this case before the November 2017 election, contending that the voters needed to be informed "whether defendant will be violating the plea agreement if elected and that a special election would be necessary in the event defendant resigns or is removed from office." Thus, it appears that the prosecutor was trying to influence the outcome of the election-at least to the extent of attempting to have defendant removed from the ballot or by providing information that would persuade voters not to vote for him. We, of course, offer no opinion on defendant's suitability for office. But we do note that "[d]emocracy does not, after all, guarantee good government or even the election of well qualified individuals." Davies , 930 F.2d at 1398. Rather, representative government "is premised on the proposition that the people are the best judges of their own interests, and that in the long run it is better to permit them to make their own mistakes than to permit their 'rulers' to make all their decisions for them." Id.

As a result, we do not reach the issue whether the provision violates the separation-of-powers doctrine.

People v Siebert , 450 Mich. 500, 504, 537 N.W.2d 891 (1995) (opinion by Boyle , J.).

Id . at 510, 537 N.W.2d 891.

Id ., citing Genesee Prosecutor v. Genesee Circuit Judge , 386 Mich. 672, 684, 194 N.W.2d 693 (1972) (noting that because the determination of charges is an executive act, "[f]or the judiciary to claim power to control the institution and conduct of prosecutions would be an intrusion on the power of the executive branch of government and a violation of the constitutional separation of powers. ... It also violates our fundamental sense of fair play").

Siebert , 450 Mich. at 510, 537 N.W.2d 891 (opinion by Boyle , J.).

The Court of Appeals here quoted People v Swirles (After Remand) , 218 Mich.App. 133, 135, 553 N.W.2d 357 (1996), for the rule that " 'contractual theories will not be applied if to do so would subvert the ends of justice.' " Smith (On Remand) , 321 Mich.App. at 96, --- N.W.2d ----. This statement does not suggest that courts have some inherent power to redraft plea agreements simply because those agreements are not based solely on contractual theories. The Court of Appeals also quoted People v. Jackson , 192 Mich.App. 10, 15, 480 N.W.2d 283 (1991), for the proposition that plea bargains " 'must be reviewed within the context of their function to serve the administration of criminal justice.' " Smith (On Remand) , 321 Mich.App. at 96, --- N.W.2d ----. But it is one thing to review a plea deal in that context and another to refashion a plea deal to further what the court may think is the goal of criminal justice in a given case.

I also agree with the dissent's conclusion that the bar-to-office provision is not properly analyzed as a violation of the separation of powers, although this is not ultimately outcome-determinative given that I conclude the agreement here was void for other reasons.

I agree with the Court's unanimous conclusion that plea agreements, while not exactly the same as contracts, are appropriately analogized to contracts for these purposes.

Rumery itself said that it was founded on "traditional common-law principles." Rumery , 480 US at 392, 107 S.Ct. 1187. As one commentator has noted:
It is debatable, however, whether the Rumery majority identified the appropriate "well-established" common law principle. The common law fairly bristles with other appropriate starting points for analysis, most of which would point to the per se voidability of release-dismissal bargains. Contracts induced by threats of prosecution are voidable at common law, and duress by imprisonment can prevent the enforcement of releases. At common law, obtaining items of value under color of public office constituted the crime of extortion, and the common law offense of "compounding a crime" punished agreements not to prosecute a crime in exchange for payment. It should be no surprise, therefore, that before Rumery , the weight of state and federal precedent had prohibited such agreements. [Kreimer, Releases, Redress, and Police Misconduct: Reflections on Agreements to Waive Civil Rights Actions in Exchange for Dismissal of Criminal Charges , 136 U Pa L Rev 851, 861-862 (1988).]
Rumery cited 2 Restatement Contracts, 2d, § 178(1), p 6, as evidence of its "traditional common-law principles," although even the Restatement acknowledges that "a decision as to enforceability is reached only after a careful balancing" "[i]n doubtful cases," while "[i]n some cases the contravention of public policy is so grave ... that unenforceability is plain." Id . at § 178, comment b . I have no objection to a balancing test as such, but I believe our common-law traditions demonstrate that this is not a "doubtful case."

The dissent alleges that "[t]his is an entirely judicially manufactured 'public policy,' " but the rule against contracts impairing elections or public office is no more "judicially manufactured" than other common-law rules, such as the elements of negligence or contract formation. It is a well-established aspect of our common law of contracts, as documented by these treatises and the caselaw discussed in this opinion. Of course, the Legislature is free to change this statutorily. The dissent notes that MCL 750.118 says that a public official who accepts a bribe is "forever disqualified to hold any public office[.]" I do not question the Legislature's authority to impose a bar to holding office as a punishment for an offense, but I believe it is properly confined to situations in which the Legislature has specifically authorized it as a punishment for a particular crime. That the Legislature has authorized it for some crimes does not, in my judgment, reflect a public policy that it is available as a punishment for any offense a defendant might commit, especially in the face of our longstanding common-law rule against judicial enforcement of agreements that impair elections or public office. That said, I do not question the Legislature's ability to specifically authorize by statute the sort of negotiation that occurred in this case.

The case with the most similar facts is arguably United States v. Richmond , 550 F.Supp. 605 (E.D.N.Y., 1982). In that case, the defendant, a member of Congress, entered into a plea agreement requiring him to resign from Congress and withdraw as a candidate for re-election. The court purported to "void" those terms because they "conflicted with the fundamental right of the people to elect their representatives," "interfered with the principle of separation of powers," and allowed for "Executive domination of members of Congress through the threat of forced resignations." Id . at 606. In my view, Richmond erred by focusing on a nebulous right of the people to elect their representatives and consequences on interbranch relations, rather than approaching this as a matter of what sort of bargain the defendant could make with his office.

See also Benson v. Bawden , 149 Mich. 584, 113 N.W. 20 (1907). In that case, the plaintiff was a Bessemer shopkeeper who wanted a post office located next to his store. He purchased the local post office's furniture and fixtures from the retiring postmaster and offered to sell them to the newly appointed postmaster for $1 if he would relocate the office next to the plaintiff's store. The new postmaster agreed to the move, which was subject to certain provisions allowing the plaintiff to reclaim the property in the future. When the plaintiff sought to exercise this power, the trial court allowed it. Although we ultimately affirmed the judgment on the ground that the parties were "equally in the wrong," id . at 588, 113 N.W. 20, we expressed our view of the "illegal agreement" in no uncertain terms, stating that the postmaster "should be disinterested" in "exercis[ing] his official judgment" and that the notion that an official could be "hired to act in the interest of any individual" was "shocking to a decent sense of propriety." Id . at 587, 113 N.W. 20.

To be clear, I agree with the Court's unanimous conclusion that in this case, there is no reason to think the prosecutor was acting out of self-interested motivations.

It may be the case that a Plugger -type case today would be more amenable to an analysis under Restatement § 178 (given that it did not involve running for public office, but rather public contracting), but it is evidence that this Court has historically not been shy about invalidating contracts involving potential public corruption.

The dissent invites me to "consider the corollary to" "the common-law rule against the sale of office by contract," which it characterizes as courts being unwilling to "restore the parties to their original position," citing Snyder , 33 Mich. at 497. But in Snyder , the Court refused to "compel execution of a contrivance to violate the law." Id . at 496. Here, by contrast, the trial court has already violated the law by imposing a plea agreement on the prosecutor in violation of the separation of powers. I do not concur with the Siebert remand in order to restore any party to its original position, but rather to cure the trial court's violation of the separation of powers. While that happens to restore the prosecutor to her original position, this Court cannot tolerate the trial court's overstepping its bounds and, in violation of Siebert , exercising an executive function by imposing a plea deal on the prosecutor, regardless of the resulting consequences of unwinding that violation of the separation of powers.

Defendant was also required to comply with plea obligations that are not in dispute, including attendance at alcohol- and drug-treatment programs.

Defendant received the second-highest number of votes in the August 2017 primary election for Detroit City Council, District 2, thus proceeding to the November 2017 general election where he lost to Roy McCalister, Jr.

Judge Riordan , the dissenting Court of Appeals judge, would have granted the motion, agreeing with the prosecutor that "resignation, withdrawal, or forbearance from holding a public office may be part of a plea agreement." People v Smith , unpublished order of the Court of Appeals, entered June 2, 2017 (Docket No. 332288), p 2.

The Court of Appeals dissent again concluded that the challenged obligations of the plea agreement were not unconstitutional: "There is nothing even remotely indicating that the prosecutor crossed the threshold of the separation of powers and forcibly tried to remove defendant from office. ... I disagree with the majority's blanket prophylactic prohibition on negotiated plea agreements between prosecutors and public elected officials." Id . at 103-104, --- N.W.2d ---- ( Riordan , J., dissenting). The dissent also concluded that "the trial court abused its discretion when it denied the prosecution's motion to vacate defendant's plea agreement." Id . at 105, --- N.W.2d ----.

I do not believe that the "interests of the People" standard would ever likely be satisfied by an agreement imposing a bar-to-office obligation that was designed to further the prosecutor's political, partisan, or personal interests. However, no such argument has been made in this case. Rather, as the trial court stated during sentencing when voiding the obligations at issue, "I don't think that Prosecutor [Kym] Worthy's intention was anything but benign, that she had the best interest of the community."

Malicious destruction of property valued at $20,000 or more, for example, is "punishable by imprisonment for not more than 10 years ...." MCL 750.377a(1)(a). If defendant had been convicted of that offense and sentenced to the maximum 10-year term, he would effectively have been unable to hold public office for the entirety of that term.

It goes without saying that no person can be dragooned into a public office that he or she has promised to relinquish in the course of a plea agreement, or otherwise be compelled to subordinate his or her personal interest in minimizing exposure to criminal punishment.

To the extent that the bar-to-office obligation also bars defendant from holding judicial office, I would conclude similarly that the obligation does not add to the constitutional provisions concerning the qualifications of judicial officers. Nor does the obligation infringe this Court's principal authority to determine those qualifications.

The United States Supreme Court held that Congressman Adam Clayton Powell Jr. could be "expelled" by a two-thirds vote of the House of Representatives, but he could be denied membership by a simple majority vote only if he failed to satisfy the constitutional prerequisites for membership. See US Const, art I, § 5.

Because the issue concerning the resignation obligation is moot and defendant can no longer resign from office, this case does not implicate constitutional provisions concerning expulsion from office. See, e.g., Const 1963, art 5, § 10 ("The governor ... may remove or suspend from office for gross neglect of duty or for corrupt conduct in office, or for any other misfeasance or malfeasance therein, any elective or appointive state officer, except legislative or judicial ....").

"The trial judge's role in the plea-bargaining procedure" should "remain that of a detached and neutral judicial official." Killebrew , 416 Mich. at 205, 330 N.W.2d 834.

See, e.g., MCR 6.302(C)(1) (stating that a plea of guilty or nolo contendere may be entered in accordance with a plea agreement between "the prosecutor and the defendant's lawyer"); Killebrew , 416 Mich. at 199 & n 1, 330 N.W.2d 834 (noting, in the context of "charge bargaining," that "[t]he decision to prosecute under one statute rather than another, or to prosecute at all, is an exclusively executive function, vested within the discretion of the prosecutor").

I emphasize that a serious criminal record is not a categorical bar to holding public office in this state. However, I can discern no "public policy" against individuals with such records voluntarily refraining from holding public office when to do so offers them some personal advantage.

As an example, the relatively serendipitous fact that a relative of a criminal defendant may also be facing prosecution has always been viewed as a proper subject of plea negotiations. See Miles v. Dorsey , 61 F.3d 1459, 1468 (C.A. 10, 1995) ("[S]o long as the government has prosecuted or threatened to prosecute a defendant's relative in good faith, the defendant's plea, entered to obtain leniency for the relative, is not involuntary.").

Moreover, I am unaware of the slightest evidence that any prosecutor of this state has ever imposed a bar-to-office condition in circumstances giving rise to concerns about the politicization, partisanship, or taking of personal advantage on the part of the prosecutor. And of course, there is not the slightest evidence that the prosecutor in the instant case has been motivated by such considerations. See note 5 of this opinion. The Court of Appeals' and the lead opinion's reasoning, if accepted, would, of course, also lead to the slippery-slope conclusion that prosecutors should not be enabled to bring charges against public officials in the first place because this too would potentially "open the door" to exactly the same concerns of politicization, partisanship, and personal advantage raised by the lead opinion in this case.

Having concluded that the issue concerning the resignation obligation is moot and that the bar-to-office obligation is constitutional and not void as against public policy, I need not address the prosecutor's argument that the trial court abused its discretion by denying her motion to vacate the plea after ruling that those two obligations were invalid.

See, e.g., MCL 168.51 ("A person shall not be eligible to the office of governor or lieutenant governor unless the person has attained the age of 30 years ....").

See, e.g., MCL 168.391(1) ("[A] person shall not be eligible to the office of justice of the supreme court unless the person ... at the time of election or appointment is less than 70 years of age.").

See, e.g., MCL 750.118 (providing that a public officer who is found guilty of accepting a bribe under that statute is "forever disqualified to hold any public office").

See, e.g., MCL 168.163(1) (providing that "a candidate for nomination by a political party for the office of state senator or representative" must file "nominating petitions signed by a number of qualified and registered electors residing in the district as determined under" MCL 168.544f ).

See, e.g., MCL 168.161(1) ("A person shall not be eligible to the office of state senator or representative unless the person is a citizen of the United States and a registered and qualified elector of the district he or she represents by the filing deadline ....").

Id .

Id .

See, e.g., MCL 168.411(1) ("A person shall not be eligible to the office of judge of the circuit court unless the person ... is licensed to practice law in this state ...."); MCL 600.940(1) (providing that graduation from law school is a prerequisite to obtaining a license to practice law).

See note 24 of this opinion.

See, e.g., Const 1963, art 2, § 4 ("The legislature shall enact laws to regulate the time, place and manner of all nominations and elections, except as otherwise provided in this constitution or in the constitution and laws of the United States.").

See, e.g., MCL 168.392 ("At its fall state convention, each political party may nominate the number of candidates for the office of justice of the supreme court as are to be elected at the next ensuing general election.").

See note 21 of this opinion.

At most, the lead opinion highlights MCL 168.931, which defines unlawful solicitation of "valuable consideration" from a candidate as including "money, property, a gift, a prize or chance for a prize, a fee, a loan, an office, a position, an appointment, or employment." MCL 168.931(4). Notably, each of those things is generally understood as having economic value, and any applicability to criminal cases, plea bargaining, or both is considerably far-fetched.

I also disagree with the lead opinion's decision to import the test from Davies , a decision of the United States Court of Appeals for the Ninth Circuit. "Although state courts are bound by the decisions of the United States Supreme Court construing federal law, there is no similar obligation with respect to decisions of the lower federal courts." Abela v. Gen. Motors Corp. , 469 Mich. 603, 606, 677 N.W.2d 325 (2004) (citation omitted). Indeed, Davies did not even apply federal law that has particular relevance to this Court, such as Fourth Amendment law. Rather, Davies applied the federal common law. But absent a " 'uniquely federal interest[ ],' " Boyle v. United Technologies Corp. , 487 U.S. 500, 504, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (citation omitted), that has not been advanced here, we must apply Michigan law. That is, when deciding whether a contract obligation is void as against the public policy of Michigan, we must consider the indicators of public policy in Michigan. See Terrien , 467 Mich. at 68, 648 N.W.2d 602 ("As the term 'public policy' is vague, there must be found definite indications in the law of thesovereign to justify the invalidation of a contract as contrary to that policy.") (quotation marks and citation omitted; emphasis added). Town of Newton v. Rumery , 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), another case on which the lead opinion relies, is also inapposite. Rumery concerned the federal common law, id . at 392, 107 S.Ct. 1187, and a release-dismissal agreement, id . at 393, 107 S.Ct. 1187. This case concerns neither the federal common law nor release-dismissal agreements. Examining federal law to resolve this case is as inapt as examining Montana law for the same purpose. See Mont Code Ann 46-18-202(1)(a) ("The sentencing judge may also impose any of the following restrictions or conditions on the sentence provided for in 46-18-201 that the judge considers necessary to obtain the objectives of rehabilitation and the protection of the victim and society: (a) prohibition of the offender's holding public office ....").

See MCL 771.4 ("All probation orders are revocable in any manner the court that imposed probation considers applicable either for a violation or attempted violation of a probation condition ....").

Even if I accepted the premise that the bar-to-office obligation operates somehow as a restriction on the right of voters to elect whomever they choose, I still fail to grasp how it follows that the bar-to-office obligation is void in its entirety. By even the lead opinion's analysis, the bar-to-office obligation would only seemingly be void to the extent that it concerned elected office. To the extent that it concerned appointed office, this seemingly would not implicate the "voters' right" to elect public officials of their choice.

It would be anomalous to conclude otherwise. Under MCL 168.758b, "[a] person who ... has been legally convicted and sentenced for a crime for which the penalty imposed is confinement in jail or prison shall not vote, offer to vote, attempt to vote, or be permitted to vote at an election while confined." That is, a person cannot vote while serving time in jail or prison after conviction. Thus, for example, a person who is convicted of felonious assault and sentenced to the maximum prison term of four years, MCL 750.82(1), cannot vote for anyone, including himself or herself, for public office during that time. It is difficult to conclude that the voters' right to elect public officials of their own choosing would be violated by a prohibition against the person holding public office during that time, where that person cannot even vote for himself or herself during that time. Why, then, can a trial court not impose a bar-to-office obligation for four years or less for the same crime, when the defendant is not in prison but rather on parole or probation and when the defendant has specifically agreed to accept such an obligation?

Moreover, candidates for public office regularly enter into contracts to pay television stations for advertising time. Yet, in a sense, such contracts, in the lead opinion's words, "commoditize" public office because the television station profits from the fact that the public office exists and the candidate is seeking it. Similarly, candidates for public office regularly contract to pay individuals to work on their campaigns. Again, such contracts "commoditize" public office because the individuals who receive payment benefit from the fact that the public office exists and the candidate is seeking it. But no one would suggest that either such type of contract is void as against public policy because it "commoditizes" public office.

The cases cited by the concurrence in support of its broad rule that a defendant cannot "bargain[ ] away his ability to run for office for something of value to him" concerned private, commercial contracts. See, e.g., Snyder v. Willey , 33 Mich. 483 (1876) (voiding a promissory note on the basis of public policy). However, as already noted, "[t]he standards of commerce do not govern, and should not govern, the administration of criminal justice." Reagan , 395 Mich. at 314, 235 N.W.2d 581.

If the concurrence is correct that the bar-to-office obligation is void as against public policy under the common-law rule against the sale of office by contract, as a matter of consistency, it might also consider the corollary to that rule: that the courts nonetheless will not restore the parties to their original position. Snyder , 33 Mich. at 497 ("[T]he court can never recognize any rule by which the plaintiff must either have an enforcement of the promise made to him or else be put back where he was before he acted in furtherance of his illegal agreement[.]"). However, the concurrence agrees with the lead opinion that this case should be remanded to the trial court to allow "the prosecutor to withdraw from the [plea] agreement." Ante at 737 (CLEMENT, J., concurring in part). That is, the concurrence agrees with the lead opinion that the prosecutor should be put back to her original position before she "acted in furtherance of [her] illegal agreement." I see no reason why the concurrence would treat the instant case, a criminal case involving a plea agreement, differently from cases such as Snyder , unless, in fact, there are principled distinctions between the instant case and commercial cases such as Snyder .

There is also at least some small irony in a decision purportedly grounded in "voters' rights" and the democratic will, emerging from the least representative branch of state government and categorically barring all bar-to-office pleas, notwithstanding the many exceptions to the asserted "public policy" that have emerged from the democratic process itself, see notes 17 to 28 of this opinion, not least of which is the concurrence's proposed nullification of the decisions of elected and accountable prosecutors not only in the instant case but in all future cases as well.